# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. 99-12465-EFH |
| | ) | |
| Plaintiff, | ) | **DEFENDANTS'** |
| | ) | **MEMORANDUM OF** |
| v. | ) | **POINTS AND AUTHORITIES** |
| | ) | **IN SUPPORT OF COMBINED** |
| CHARLES JOHNSON, FRANCIS VANER JOHNSON, | ) | **MOTION FOR SUMMARY** |
| GENELDA JOHNSON, and JOHNSON | ) | **JUDGMENT PURSUANT TO** |
| CRANBERRIES LIMITED PARTNERSHIP, a | ) | **RULE 56(b) AND RULE 56(d)(1)** |
| Massachusetts limited partnership, | ) | **AND OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| Defendants. | ) | **SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SCOPE OF THE REMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.   Substantive Standards for Summary Judgment Motions . . . . . . . . . . . . . . . . . . . . . . 9

    B.   Standards for Admissibility of Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   Supreme Court Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.   First Circuit Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

LEGAL BACKGROUND AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.   The Scope of Clean Water Act Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.   *Rapanos v. United States* and the
         Standards for Clean Water Act Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.   Plurality and Concurring Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.   The Plurality Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            a.   Nonnavigable Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                i.   Natural v. Man-made Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                ii.   Relative Permanence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                iii.   Connection to Traditional Interstate Navigable Waters . . . . . . . . . . . . 16

            b.   Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Page

3. The Kennedy Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    a. Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        i. The "Significant Nexus" Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        ii. Substantial Evidence, Speculation, and Site-Specific Data . . . . . . . . . . . . 19

    b. Nonnavigable Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    c. Inseparably Bound Up with Waters of the United States . . . . . . . . . . . . . . . . . . 21

    d. Summary of the Kennedy "Significant Nexus" Standard . . . . . . . . . . . . . . . . . 21

    e. "Similarly Situated Lands in the Region" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Pre-Disturbance Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D. Wetlands Adjacent to Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    1. The Regulatory Exclusion and "Adjacency" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    2. The Plurality Opinion Rejects the Regulatory Definition of "Adjacent" . . . . . . . . . 26

    3. The Kennedy Concurring Opinion Requires a Probing
       Case-by-Case Inquiry as to Whether Any Particular
       Wetland Is "Adjacent" to a Body of Open Water . . . . . . . . . . . . . . . . . . . . . . . . . 26

E. There Can Be No Liability Under the CWA Without a Discharge . . . . . . . . . . . . . . . . . . 28

F. Navigability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE
   GRANTED AND THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
   SHOULD BE DENIED UNDER THE *RAPANOS* PLURALITY TEST . . . . . . . . . . . . 32

    A. Cross Street Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       1. None of the Wetlands or Waters on the Cross Street Site Is
         Jurisdictional Under the *Rapanos* Plurality Test . . . . . . . . . . . . . . . . . . . . . . . 32

a.   Beaver Dam Brook and Its Abutting Wetlands Are Not
Jurisdictional   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

b.   The Unnamed Tributary and Its Abutting Wetlands Are Not
Jurisdictional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

i.   The Short Segment of the Unnamed
Tributary Is Not Jurisdictional Under the Plurality Test   . . . . . . . . . . 36

ii.   The Extended Segment of the Unnamed Tributary
Is Not Jurisdictional Under the Plurality Test   . . . . . . . . . . . . . . . . . . . 37

iii.   The Unnamed Tributary Is Not Jurisdictional Because
It Is Not Otherwise a Relatively Permanent Water . . . . . . . . . . . . . . . . 38

iv.   All Wetlands Abutting Any Portion of the Unnamed
Tributary Are Clearly Distinguishable from the Unnamed
Tributary and Therefore Are Not Jurisdictional . . . . . . . . . . . . . . . . . . 38

c.   The Constructed Agricultural Reservoirs and Their Neighboring
Wetlands Are Not Jurisdictional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.   Fosdick Street Site   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.   None of the Alleged Areas of Discharge on the Fosdick Street Site Is
Jurisdictional Under the Plurality Test   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

a.   The Reservoir and Its Abutting Wetlands Are Not Jurisdictional   . . . . . . . . 41

i.   The Reservoir Is Not Jurisdictional Under the Plurality Test . . . . . . . . 41

ii.   The Wetlands Near the Reservoir . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

b.   The Western Tributary and Its Abutting Wetlands   . . . . . . . . . . . . . . . . . . . 43

i.   The Western Tributary   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ii.   The Wetlands Near the Western Tributary . . . . . . . . . . . . . . . . . . . . . . 46

C.   None of the Alleged Areas of Discharge on the Forest/Fuller Street Site Is
Jurisdictional Under the *Rapanos* Plurality Test   . . . . . . . . . . . . . . . . . . . . . . . . . 46

1.   Log Swamp Reservoir and Its Abutting Wetlands   . . . . . . . . . . . . . . . . . . . . . . 47

**Page**

      a.   The Reservoir Is Man-made . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

      b.   The Wetlands Abutting Log Swamp Reservoir Are Clearly
           Distinguishable from the Water in the Reservoir . . . . . . . . . . . . . . . . . . . . 48

  2.   Open Water to the North and East of
      Bog A and Their Abutting Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

      a.   The Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

      b.   The Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

      c.   The Waters and Wetlands at the Forest/Fuller Street Site
           Are Not Jurisdictional Under the Plurality Test Because
           There Was Little or No Surface Water Flow from the
           Forest/Fuller Street Site to the Weweantic River . . . . . . . . . . . . . . . . . . . . 50

II.  UNDER THE KENNEDY TEST, THE DEFENDANTS' MOTION
    FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND THE
    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD
    BE DENIED, WHILE THE EVIDENCE OF THE PLAINTIFF'S EXPERTS
    SHOULD BE EXCLUDED UNDER *DAUBERT* PRINCIPLES . . . . . . . . . . . . . . . . . . . 51

  A.  The Plaintiff's Chemical Nexus Analysis Is Flawed, Inconsistent,
      Scientifically Unsupportable, and Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    1.   The Government's Chemical Nexus Case
       Is Based on a Physical Impossibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    2.   The Government's Chemical Nexus Claims Should Be Excluded from
       Evidence Under *Daubert* Principles Because They Are Unreliable . . . . . . . . . 55

    3.   The Government's Chemical Nexus Evidence
       Is Contrary to the Post-*Rapanos* Guidance . . . . . . . . . . . . . . . . . . . . . . . . . 56

    4.   Substantial, Nonspeculative Evidence Does Not Exist
       To Support the Government's Chemical Nexus Claims . . . . . . . . . . . . . . . . . . 57

  B.  The Plaintiff's Physical Nexus Analysis Is Flawed, Inconsistent,
      Scientifically Unsupportable, and Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    1.   The Government's Groundwater Discharge/Baseflow Recharge
       Evidence Undercuts the Government's Physical Nexus Claims . . . . . . . . . . . . 57

Page

2. The Government's Evidence Regarding Surface Water Flow Is Faulty . . . . . . . 60

3. The Government Has Not Shown the Extent to Which Floodflow
Alteration Occurred at the Johnson Sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

4. The Government's Physical Nexus Claims Should Be Excluded from
Evidence Under *Daubert* Principles Because They Are Unreliable . . . . . . . . . 62

5. Substantial, Nonspeculative Evidence Does Not Exist
To Support the Government's Physical Nexus Claims . . . . . . . . . . . . . . . . . . . . . 63

C. The Plaintiff's Biological Nexus Analysis Is Flawed, Inconsistent,
Scientifically Unsupportable, and Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

1. The Pre-Alteration Biological Nexus Evidence Is Virtually Nonexistent . . . . . . 64

2. The Government's Biological Nexus Claims Should Be
Excluded from Evidence Under *Daubert* Principles
Because the Biological Evidence Is Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . 65

3. Substantial, Nonspeculative Evidence Does Not Exist
To Support the Government's Biological Nexus Claims . . . . . . . . . . . . . . . . . . . 66

III. MANY OF THE WETLANDS AT THE SITES QUALIFY FOR THE
REGULATORY EXCLUSION OF WETLANDS ADJACENT TO WETLANDS
UNDER BOTH THE PLURALITY TEST AND THE KENNEDY TEST . . . . . . . . . . . 66

IV. NAVIGABILITY OF THE WEWEANTIC RIVER
BEGINS AT THE MILE 4.4 POINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

V. ADDITIONAL SPECIFIC RESPONSES TO THE GOVERNMENT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . 69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 951 F. Supp. 267 (D.D.C. 1997) . . . . . . . . . 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*,
425 F.3d 1150 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bourjaily v. United States*, 483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 11-12, 56, 63, 65

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Christensen v. Harris County*, 529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

*Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cortes-Irizarry v. Corporacion Insular de Seguros*,
111 F.3d 184 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 55, 62, 65

*Crowe v. Marchand*, 506 F.3d 13 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . passim

*Director, Office of Workers' Comp. Programs v. Gen. Dynamics Corp.*,
980 F.2d 74 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*First Marblehead Corp. v. House*, 541 F.3d 36 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FPL Energy Maine Hydro LLC v. FERC*, 287 F.3d 1151 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . 31

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Spigel*, 260 F.3d 27 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Margarian v. Hawkins*, 321 F.3d 235 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Page**

*Morton v. Ruiz*, 415 U.S. 199 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 57

*Musgrave v. Sullivan*, 966 F.2d 1371 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   440 F.3d 459 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35, 41

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   311 F. Supp. 2d 91 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   No. 01-0274, 2007 U.S. Dist. LEXIS 6366 (D.D.C. Jan. 30, 2007) . . . . . . . . . . . . . 28, 35, 41

*Nat'l Indep. Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388 (1976) . . . . . . . . . . . . . . . . . . 24, 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) . . . . . . . . 28

*PacifiCorps Elec. Operations*, 73 FERC ¶ 61,365 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 68

*Passamaquoddy Tribe v. Maine*, 75 F.3d 784 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ralar Distributors, Inc. v. Rubbermaid, Inc.*, 4 F.3d 62 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . 10

*Rapanos v. United States*, 547 U.S. 715 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Sierra Pac. Power Co. v. FERC*, 681 F.2d 1134 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . 30

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
   531 U.S. 159 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20-21, 30

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Acquest Transit LLC*, No. 09-CV-055S,
   2009 U.S. Dist. LEXIS 60337 (W.D.N.Y. July 15, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Alcon Labs.*, 636 F.2d 876 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . 24, 29

*United States v. Appalachian Elec. Power Co.*, 311 U.S. 377 (1940) . . . . . . . . . . . . . . . 29-30, 68

*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Caceres*, 440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 56-57

*United States v. Campbell*, 168 F.3d 263 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Page

*United States v. Cundiff*, 480 F. Supp. 2d 940 (W.D. Ky. 2007),
    *aff'd*, 555 F.3d 200 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Fabian*, 522 F. Supp. 2d 1078 (N.D. Ind. 2007) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Garafano*, 61 F.3d 113 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Johnson*, 437 F.3d 157 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 1, 4-6, 13

*United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Lucas*, 516 F.3d 316 (5th Cir.), *cert. denied*, 129 S. Ct. 116 (2008) . . . . . . . . 15

*United States v. Moore*, 131 F.3d 595 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) . . . . . . . . . . . . . . . . 17, 21

*United States v. Stout*, 599 F.3d 549 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statutes**

33 U.S.C. § 1251, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

    § 1341(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    § 1362(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35, 41

    § 1362(12)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    § 1362(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Page**

## Regulations

33 C.F.R. § 323.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

§ 323.2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 328.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§ 328.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§ 328.3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§ 328.3(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 67

§ 328.3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26

§ 328, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 230.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§ 230.3(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§ 230.3(s)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§ 230.3(s)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 67

§ 230.3(t)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§ 230, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Rules

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12, 55, 62, 65

## Miscellaneous

73 Fed. Reg. 79,641 (Dec. 30, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Frank, Richard M., *Forever Free:  Navigability, Inland Waterways, and
the Expanding Public Interest*, 16 U.C. Davis L. Rev. 579 (1983) . . . . . . . . . . . . . . . . . . . . 29

**Page**

Linn, Thomas F., Note, *Deficiencies in the Regulatory Scheme of the Federal Water Pollution Control Act Amendments of 1972*, 19 St. Louis U. L.J. 208 (1974) . . . . . . . . . . . 30

Pierce, Jr., Richard J., *Canoes Count but Kayaks Do Not*, 53 Syr. L. Rev. 1067 (2003) . . . . . . 31

Pub. L. No. 93-595, § 1 (Jan. 2, 1975), 88 Stat. 1937 (Apr. 17, 2000) effective Dec. 1, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sapp, William L., et al., *The Historical Navigability Test: How to Use It To Advantage in This Post-*Rapanos *World*, 37 Envtl. L. Rep. News & Analysis 10797 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sapp, William W., et al., *From the Fields of Runymede to the Waters of the United States:  A Historical Review of the Clean Water Act and the Term "Navigable Waters,"* 36 Envtl. L. Rep. News & Analysis 10190 (2006) . . . . . . . . . . . . . . 30

Sapp, William W., et al., *The Float a Boat Test*, 38 Envtl. L. Rep. News & Analysis 10439 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S. Envtl. Prot. Agency, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22-23

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Circuit remanded this case for this Court to determine whether certain waters and wetlands located at the sites at issue constitute "waters of the United States" under the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq*., in light of the United States Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006). The remand order urged the parties and this Court to "provide a clear factual record in the context of applying the new standards." *United States v. Johnson ("Johnson II")*, 467 F.3d 56, 66 (1st Cir. 2006). Pursuant to the remand order, waters and wetlands at the sites must be considered jurisdictional under the CWA if they meet the *Rapanos* jurisdictional tests of either the Scalia Plurality opinion (the "Plurality test") or the Kennedy concurring opinion (the "Kennedy test").

Charles Johnson, Francis Vaner Johnson, Genelda Johnson, and Johnson Cranberries Limited Partnership, a Massachusetts limited partnership (the "Defendants") move (1) for summary judgment pursuant to both the Plurality test and the Kennedy test, (2) for the exclusion of the testimony of the Plaintiff's expert witnesses under the principals of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) *("Daubert")*, (3) for the inclusion of all of Defendants' evidence developed pursuant to the remand discovery proceedings, and (4) for denial of the Plaintiff's motion for summary judgment.

In this Memorandum and its exhibits, as well as the accompanying Declarations of John Anderson (the "Anderson Decl."), Jeffrey Shamas (the "Shamas Decl."), and Samuel Haydock (the "Haydock Decl.") and the Defendants' Statement of Undisputed Facts (the "Defs' SOF"), Defendants demonstrate that the waters and wetlands at issue are not jurisdictional under the CWA pursuant to the Plurality test because:

1.      the waters at the sites are man-made or are not relatively permanent;

2.      the wetlands at the sites do not present any linedrawing problem because all such wetlands are readily distinguishable from any and all abutting waters;

3.      the waters and wetlands at the sites are not connected to navigable waters; and

4.      in the alternative:

   a.      there are no genuine issues of material fact with respect to the facts set forth in 1, 2 and 3, or,

   b.      the government's evidence is insufficient to support essential elements of the government's claim under the Plurality test.

Defendants demonstrate also that the waters and wetlands at issue are not jurisdictional under the CWA pursuant to the Kennedy test because:

1.      the waters at the sites are not navigable waters and do not have a significant chemical, physical and biological nexus to navigable waters; and

2.      the wetlands at the sites are not adjacent to any navigable waters and do not, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of any navigable waters, and

3.      in the alternative:

   a.      there are no genuine issues of material fact with respect to the facts set forth in 1 and 2, or,

   b.      the government's evidence is insufficient to support essential elements of the government's claim under the Kennedy test.

In addition, the Defendants demonstrate that the testimony of the Plaintiff United States' (the "government's") experts should not be admitted into evidence because:

1.      the testimony is not based upon sufficient facts and data;

2.    the testimony is not based upon reliable principles and methods; and

3.    the actual principles and methods used by the government's experts have not been applied reliably to the facts of the case.

Further, the Defendants demonstrate that:

1.    the pre-remand record alone does not provide this Court with a sufficient basis upon which to make judgments regarding whether the sites at issue are jurisdictional under either of the two *Rapanos* tests; and

2.    the Defendants' evidence developed pursuant to the remand discovery proceedings should be considered fully because such evidence is required to provide the "clear factual record" urged by the Court of Appeals in its remand to this Court for adjudication under the *two Rapanos* tests.

Additionally, the Defendants demonstrate that some of the wetlands at the sites are excluded from regulation because they fit within a regulatory exclusion based upon:

1.    the Plurality test, and

2.    the Kennedy test.

Finally, the Defendants demonstrate that the government's motion for summary judgment should be denied because:

1.    there is insufficient evidence to support essential elements of the government's claim under both *Rapanos* standards, or, in the alternative,

2.    there are genuine issues of material fact in connection with the government's motion.

## PROCEDURAL BACKGROUND

The government filed this CWA civil enforcement action against the Defendants in 1999, alleging that they had filled "waters of the United States" on three separate properties. Dkt. No. 1.

- 3 -

In 2004, the government successfully moved for summary judgment against the Defendants, who were unrepresented by counsel at the time and who did not file a formal motion in opposition to the government' motion for summary judgment.  Dkt. No. 67.  Following the entry of the court's order, Nos. 74-75, the Defendants filed an appeal to the First Circuit, Dkt. No. 79.  In its original decision, the Court of Appeals affirmed this Court's judgment, holding that the CWA extends to the sites at issue.  *United States v. Johnson (Johnson I)*, 437 F.3d 157 (1st Cir. 2006).  The Defendants then moved for rehearing of that decision in light of the Supreme Court's grant of certiorari in *Rapanos*. The Court of Appeals stayed the rehearing request pending the Supreme Court's adjudication. Following *Rapanos*' issuance, the Court of Appeals  filed a superseding opinion vacating its prior opinion and  remanding the case back to this Court to reassess its jurisdictional findings in light of *Rapanos*.  *Johnson II*, 467 F.3d 56.  Following remand, the parties conducted extensive factual and expert discovery pursuant to this Court's remand order.  Dkt. No. 98.

## SCOPE OF THE REMAND

The government asserts in its brief that this Court need only accept all of the pre-remand evidence, which it claims has been admitted by Defendants, and that such evidence is sufficient to show that the waters and wetlands at issue in this case are jurisdictional under both the Kennedy and the Plurality opinions under *Rapanos*.  Such an assertion is erroneous for the following reasons.

First, if the evidence were sufficient in the pre-remand record to hold the Defendants liable under the *Rapanos* standards, there would have been no reason for the Court of Appeals to have remanded this case to this Court with a mandate to fully develop the facts necessary to determine whether the wetlands and waters at issue in this case are jurisdictional under the two new legal standards set forth in *Rapanos*.  *See Johnson II*, 467 F.3d at 66 ("We urge the parties and the district court to provide a clear factual record in the context of applying the new standards.").

Second, the government's own Motion to Govern Proceedings on Remand, granted by Court Order dated May 3, 2007 (Dkt 98), states that there are substantial factual issues that must be developed in order to address the new *Rapanos* standards, including (1) "whether the waters and wetlands at the sites" are of the type that are "subject to federal regulatory jurisdiction" under the new standards, (2) the "nature of the connection" between waters and wetlands at the sites and the Weweantic River, (3) the "character" of the waters and wetlands at the three sites, and (4) the extent to which such waters and wetlands "posses the characteristics necessary to satisfy" the new jurisdictional tests.  These factual gaps are admitted by the government, and there is no question that the Defendants may introduce evidence regarding them.  Defs' SOF ¶ 7; Defs Mot. Ex. 1 at 003-10.

Third, the same government motion spells out precisely what cannot be "relitigated," and the list is limited to the following five types of facts:  (1) the location and extent of waters and wetlands "at the sites," (2) that the wetlands exhibited wetland parameters of soil, vegetation, and hydrology "using the procedures in the 1987 Corps of Engineers Wetlands Delineation Manual," (3) that the "waters and wetlands at the subject sites are within the Weweantic River Watershed," (4) that among the waters and wetlands at the sites there was some type of unspecified "surface hydrological connection to the Weweantic River," and (5) that dredged or fill material was discharged to waters and wetlands at locations on the sites that were not specified in the government's motion.  Defs' SOF ¶ 161(c); Defs Mot. Ex. 1 at 003-10.  Any and all relevant facts not included among the foregoing list are ones that need to be addressed by this Court and the parties to comply with the mandate of the Court of Appeals "to provide a clear factual record in the context of applying the new standards."  *Johnson II*, 467 F.3d at 66.  Under the Plurality test such relevant facts include but are not limited to (1) whether pre-disturbance waters at the sites were man-made or relatively permanent and the *extent* to which they were connected to the navigable portions of the

Weweantic River *via* channelized or diffuse surface water conditions; and (2) whether pre-alteration wetlands at the sites directly abutted tributaries of the Weweantic River or other waters connected to the Weweantic River such that there was a continuous surface water connection between the wetland and the water making the two indistinguishable from each other.   Under the Kennedy standard, the relevant facts include but are not limited to (1) the *extent* to which the types of pre-disturbance wetlands located at the sites performed various wetland functions, and (2) whether those functions, when considered with "similarly situated lands in the region" had a significant chemical, physical, and biological nexus to the navigable portions of the Weweantic River.   Necessarily included in the foregoing considerations are the extent to which the Weweantic River is or is not navigable, and if any portion of it is navigable, where the point of navigability begins.  Defs' SOF ¶ 161(c).

Fourth, the government's remand experts have  stated that they relied on the pre-remand work in conducting their remand phase investigations.  Defs' SOF ¶ 161(d), (e).  If such pre-remand work is flawed, then conclusions stemming therefrom in the remand phase may be flawed.  Defendants should be free to point out the flaws in the pre-remand work to show that the remand investigations themselves are flawed *because* they are based (in whole or in part) on incorrect or improper premises.  Otherwise, there will not have been created "a clear factual record in the context of applying" the new Rapanos standards, as mandated by the court of appeals.  467 F.3d at 66.

Fifth, at least to the extent the government chose to reopen the pre-remand issues during the discovery phase of the remand proceedings, the Defendants in fairness should be able to address those issues in order to rebut the government's assertions, especially in areas where the Defendants' experts challenge the Plaintiff's experts assumptions, methodologies, analyses, and conclusions relevant to the remand phase of the litigation.  Defs' SOF ¶ 161(e).

Sixth, any issues not litigated pre-remand and which were not addressed specifically in the 2007 order, should be open for full ventilation during the remand proceedings, assuming, of course, that they are relevant to the liability of Defendants under the Clean Water Act. "The basic tenet of the mandate rule is that the district court is bound to the scope of the remand issued by the court of appeals." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). In defining the scope of the mandate, the court generally classifies a remand as either general or limited, and courts of appeals have broad discretion in determining the scope of the mandate. *Id.* "In the absence of an explicit limitation, the remand order is presumptively a general one." *United States v. Moore*, 131 F.3d 595, 598 (6th Cir. 1997). *United States v. Stout*, 599 F.3d 549 (6th Cir. 2010). *See also United States v. Garafano*, 61 F.3d 113 (1st Cir. 1995).

Seventh, the parties have engaged in well over two years of additional factual and expert discovery to get to a point where they were ready to marshall the facts and present them to this Court for a decision regarding the extent to which the waters and wetlands at issue in this case are jurisdictional under the new *Rapanos* standards. Indeed, the government filed joint motions to extend the time within which to complete post-Remand discovery on eight occasions (Dkt 103, 105, 107, 108, 111, 112, 116, 117), an unopposed unilateral motion on one occasion (Dkt 121) and has not opposed Defendants' motions for extensions on two occasions (Dkt 99, 120), for a total of eleven motions to extend over a two-year period. Clearly, the government itself believed that over two years of additional information gathering was needed in order to prove its case under the *Rapanos* standards. Otherwise it could have simply repackaged the pre-remand record for a post-remand decision. For the government now to claim essentially that the parties did not need the additional information and that this Court could have decided this case based on the pre-remand record is odd, at best. Essentially, the government is now asserting that it has participated in an

enormous waste of time and taxpayer dollars in conducting useless discovery activities for over two years.

Eighth, Defendants acknowledge that the government may use whatever facts were established in the pre-remand record to support it's post-remand case.  However, the government must actually prove its case.  Making mere allegations without a showing that such allegations in fact are true does not and cannot lead to a favorable result for the government.  As is evident from the Defendants' Statement of Facts, there are many material factual assertions made by the government that are controverted by the Defendants, as set forth in detail in Defs' SOF ¶¶ 168-277, which paragraphs are incorporated herein by reference.

Finally, if a matter has been fully established by the government in the pre-remand proceedings, the government itself should not be permitted to affirmatively contradict it's own pre-remand facts.  Thus, if the government proffered uncontroverted evidence in the pre-remand proceedings that pre-alteration wetlands at one or more of the sites in issue in this case did not perform the function of nutrient removal in the environment, it should not now be allowed to present evidence that such wetlands did perform such a function.  To hold otherwise would be to allow the government to contradict it's own previously established facts.

## FACTUAL BACKGROUND

The background facts of this case have been set forth in prior briefs in this Court, as well as in the Court of Appeals' decision.  *See Johnson I*, 437 F.3d at 160-62.  The Defendants here recite facts common to the three sites at issue, leaving site-specific facts for the Argument section.

The three sites—the Cross Street Site, the Fosdick Street Site, and the Forrest/Fuller Street Site—are all properties owned by the Defendants, on which they maintain cranberry farming operations. Defs' SOF ¶ 14.  Defs Mot. Ex. 2 at 019,  ¶¶ 14, 19.  The three sites are located varying

distances from the Weweantic River, a waterbody portions of which are navigable, which flows south from Carver to Wareham, and there empties into Buzzards Bay.  Defs' SOF ¶ 14.  The Weweantic itself is formed by the confluence of two waterbodies:  Rocky Meadow Brook and South Meadow Brook.  Defs' SOF ¶ 15.  All waters located at the sites are nonnavigable, and no site wetlands abut navigable-in-fact waters.  Defs' SOF ¶ 16.  Pre-Remand Schweisberg Decl. ¶ 16 and Tab D, reproduced in Defs Mot. Ex. 5 at 036-41.

## ISSUES PRESENTED

(1) Are any nonnavigable waters located at any of the sites "waters of the United States" under the CWA?  (2) Are any wetlands at the sites themselves "waters of the United States" under the CWA?  (3) Should the opinions of the government's experts be excluded from evidence under *Daubert* principles?  (4) Can this Court decide the remand issues with sole reference to the pre-remand record?  (5) Should the evidence developed by Defendants in connection with the discovery phase of this remand proceeding be admitted and considered in order to determine the extent to which, if any, waters and wetlands at the sites are jurisdictional under the CWA pursuant to the Plurality test and the Kennedy test of *Rapanos*?  (6) Do regulatory exclusions apply to any of the wetlands based upon *Rapanos*?

## STANDARD OF REVIEW

### A.   Substantive Standards for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Margarian v. Hawkins*, 321 F.3d 235 (1st Cir. 2003).

A party moving for summary judgment who does not have the burden of proof at trial should

prevail and have judgment entered in its favor as a matter of law upon a showing that there is

insufficient evidence in the record to support an essential element of the opposing party's claim.

*See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In so doing, the party need not seek to

affirmatively prove a defense, but rather must show, based on the record, that the opposing party will

not be able to prove its case at trial.  *Id.* at 325.  Because Defendants do not have the burden of proof

at trial, if they show that the government will not be able to sustain its burden with regard to any

required element of its claims under the two *Rapanos* tests, Defendants are entitled to judgment as

a matter of law.  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) ("'[A]s to any essential factual element

of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come

forward with sufficient evidence to generate a trial-worthy issue warrants summary judgment to the

moving party.'") (quoting *Ralar Distribs., Inc. v. Rubbermaid, Inc.*, 4 F.3d 62, 67 (1st Cir. 1993)).

## B.   Standards for Admissibility of Expert Testimony

### 1.   Supreme Court Cases

The parties agree that expert testimony is an essential aspect of this case.[1]  Federal Rule of

---

[1] Joint Motion to Revise the Discovery Plan and Motion Schedule, Doc. 103, 1:199-cv-12465-EFH, (10/26/2007) ("[P]arties have commenced the expert evaluation that is central to these proceedings on remand."); *see also* Joint Motion to Further Suspend Discovery Plan and Motion Schedule, Doc. 107, 1:199-cv-12465-EFH, (05/23/2008) ("[E]xpert evaluation . . . is central to these proceedings."); Joint Motion to Further Suspend Discovery Plan and Motion Schedule, Doc. 108, 1:199-cv-12465-EFH, (07/16/2008; Joint Motion to Revise the Discovery Plan and Motion Schedule, Doc. 111, 1:199-cv-12465-EFH, (08/22/2008) ("[T]he parties have completed fact discovery and have commenced the expert evaluation that is central to these proceedings."); Joint Motion to Revise the Discovery Plan and Motion Schedule, Doc. 116, 1:199-cv-12465-EFH, (04/10/2009) ("The parties have completed fact discovery as well as much of the expert discovery that is central to these proceedings on remand."); Joint Motion to Revise the Discovery Plan and Motion Schedule, Doc. 117, 1:199-cv-12465-EFH (06/22/2009); Defendants' Assented-to Motion to Revise the Discovery Plan and Motion Schedule, Doc. 120, 1:199-cv-12465-EFH, (11/25/2009) ("Expert discovery is central to these remand proceedings."); United States' Assent-to Motion to Revise The Discovery Plan and Motion Schedule, Doc. 121, 1:199-cv-12465-EFH, (03/10/2010) ("The expert discovery . . . has been central to these remand proceedings.").

Evidence 702, which was amended in 2000[2] based upon *Daubert* and its progeny,[3] provides three criteria for the admissibility of expert testimony:  (1) it must be based upon sufficient facts or data, (2) it must be based upon reliable principles and methods, and (3) the witness must have applied the principles and methods reliably to the facts of the case.[4]  The proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.[5]

*Daubert* set forth a non-exclusive checklist for trial courts to use in determining reliability of expert testimony,[6] and post-*Daubert* cases have expanded the list to include:  (1) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion,[7] and (2) whether the expert employs in the litigation the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.[8]  *Joiner* held that expert testimony may be excluded when based upon studies so dissimilar to the facts presented in the litigation that they are inapposite or irrelevant, 522 U.S. at 144-45, or where the expert opinion is connected to existing data only by the *ipse dixit* of the expert, 522 U.S. at 146 (studies showing that mice developed tumors when injected with massive doses of PCBs in laboratory not relevant to human exposure to PCBs in

---

[2] Pub. L. No. 93-595, § 1 (Jan. 2, 1975), 88 Stat. 1937 (Apr. 17, 2000) effective Dec. 1, 2000.

[3] *See, e.g.*, *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ("*Joiner*"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ("*Kumho*").

[4] Fed. R. Evid. 702.

[5] *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

[6] *Daubert*, 509 U.S. at 593-95.

[7] *Joiner*, 522 U.S. at 146 (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[8] *Kumho*, 526 U.S. at 151.

workplace). *Kumho* held that expert testimony may be excluded when the reliability of the expert's methodology as applied to the facts of the case has not been shown. 526 U.S. at 154 ("The relevant issue was whether the expert could reliably determine the cause of *this* tire's separation," or when based upon the unverifiable subjectivity (*id.* at 155) or the *ipse dixit* (*id.* at 157) of the expert.).

## 2.  First Circuit Cases

The First Circuit has squarely stated that a *Daubert* argument to exclude expert testimony may be included in a motion for summary judgment:

> The *Daubert* regime can play a role during the summary judgment phase of civil litigation. If proffered expert testimony fails to cross *Daubert*'s threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment.[9]

Thus, a district court has the discretion to exclude expert testimony under Federal Rule of Evidence 702 in connection with a motion for summary judgment if the expert's assumptions, methodologies, or conclusions are (1) based upon insufficient facts or data, (2) unreliable, (3) based upon studies so dissimilar to the facts presented in the litigation that they are inapposite or not relevant, (4) connected to the actual facts only by the *ipse dixit* of the expert, or (5) constitute primarily the subjective, untestable conclusions of the expert. Further, when subjected to a *Daubert* challenge, the proponent of the evidence has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence.[10]

The First Circuit has extended great deference to trial courts in connection with decisions regarding the admissibility of expert testimony. *See First Marblehead Corp. v. House*, 541 F.3d 36, 40-41 (1st Cir. 2008). Thus, in exercising its gatekeeper function under *Daubert*, this Court has

---

[9] *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).

[10] *Bourjaily*, 483 U.S. at 175-76.

substantial discretion in excluding expert testimony based on the factors set forth above.  *See Crowe v. Marchand*, 506 F.3d 13, 16 (1st Cir. 2007) (trial judge's ruling will be upheld unless manifestly erroneous).

## LEGAL BACKGROUND AND ANALYSIS

### A.      The Scope of Clean Water Act Jurisdiction

The federal government, through the Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers (the "Corps"), exercises regulatory control under the CWA over "waters of the United States," *see* 33 U.S.C. §§ 1311, 1341(a), 1362(7).  In *Rapanos*, the Supreme Court addressed whether the agencies' interpretation of the term "waters of the United States" exceeded the CWA's statutory scope.

### B.      *Rapanos v. United States* **and the**<br>        **Standards for Clean Water Act Jurisdiction**

#### 1.  Plurality and Concurring Opinions

*Rapanos* was decided without a majority opinion.  Justice Scalia wrote for a Plurality of the justices, while Justice Kennedy wrote a separate opinion concurring in the judgement.  In its post-*Rapanos* remand to this Court, the Court of Appeals instructed that CWA jurisdiction may be established on remand under either the Plurality test or the Kennedy test, or both.  *See Johnson II*, 467 F.3d at 63-64.

#### 2.  The Plurality Test

For nonnavigable waters and their related wetlands, the Plurality test involves a set of fact-intensive and site-specific issues.

### a.   Nonnavigable Waters

The Plurality held that nonnavigable jurisdictional waters are limited to "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes,'" that are themselves "connected to traditional interstate navigable waters." *Rapanos*, 547 U.S. at 739, 742 (citation omitted).   Pursuant to this test, a nonnavigable water is jurisdictional only if it is a (1) natural geographic feature, (2) having a relatively permanent flow of water, and (3) connected to a traditional interstate navigable water body.

### i.   Natural v. Man-made Waters

Necessarily excluded from the Plurality definition is any man-made feature.  The *Rapanos* Plurality goes to some length explaining how jurisdiction could be extended to man-made features only if they can be characterized as "point sources" that discharge pollutants *to* waters of the United States, *see id*. at 735-36, 742-44.   As the Plurality explains, even though some man-made features, such as "sewage treatment plants," may contain permanent and continuously flowing water, they are not jurisdictional because "ordinary usage" would not describe such man-made systems as waters "on a par with 'streams,' 'rivers,' and 'oceans.'"   *Id*. at 736 n.7.   Similarly, because in ordinary usage a man-made ditch would not be described as a stream, and an agricultural reservoir would not be described as an ocean or lake, such artificial features cannot, pursuant to the *Rapanos* Plurality, be classified as waters of the United States.   The only type of geographic water feature included within the Plurality's jurisdictional list of "stream[s,] . . . oceans, rivers, [and] lakes" that could conceivably be considered man-made is a lake, because there are man-made lakes, but the Corps' own regulations state that the term "lake" "does not include artificial lakes or ponds."   33 C.F.R. § 323.2.   Thus, man-made waters are not jurisdictional under the Plurality test.

Although the government may try to argue otherwise, the two reported appellate cases that have affirmed jurisdiction under the *Rapanos* Plurality test, *United States v. Cundiff*, 480 F. Supp. 2d 940 (W.D. Ky. 2007), *aff'd*, 555 F.3d 200 (6th Cir. 2009), and *United States v. Lucas*, 516 F.3d 316 (5th Cir.), *cert. denied*, 129 S. Ct. 116 (2008), do not require a different result. Unlike the instant case, Defendants in neither of those cases contended that man-made waterbodies were categorically nonjurisdictional under the *Rapanos* Plurality. Therefore, neither case is persuasive on a point not raised. *See generally United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (decisions are not precedent for issues not raised).

The government has issued guidance as to how the *Rapanos* Plurality test should be interpreted. *See* U.S. Envtl. Prot. Agency, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008) (the " Post-*Rapanos* Guidance" or the "Guidance").[11] The Guidance disclaims any force of law or particular persuasive value, *see id.* at 4 n.17, and does not, strictly speaking, interpret the *Rapanos* Plurality test. Instead, the Guidance seeks common ground among the *Rapanos* justices by listing propositions to which the guidance purports five justices would assent. The Guidance asserts jurisdiction exists over "relatively permanent non-navigable tributaries of traditional navigable waters" that have flow at least three months per year, *see id.* at 6, but fails to state that man-made features which are not described in ordinary parlance as streams, rivers, lakes, or oceans are not, and cannot be, "relatively permanent waters." As such, the Guidance flatly ignores this important aspect of the *Rapanos* Plurality decision and should be given no effect by this Court on the issue of whether

---

[11] *See* Defs Mot. Ex. 23 at 459-72.

jurisdiction under the CWA is limited to natural waters.[12]  "Interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law do not warrant *Chevron*-style deference."  *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

### ii.   Relative Permanence

Under the Plurality test, "waters of the United States" are limited to relatively permanent waters that generally flow or stand continuously as "fixed bodies of water," which may be described as "open waters."  *Rapanos*, 547 U.S. at 733, 735 (Plurality opinion).  Thus, even natural channels that contain "intermittent" or "ephemeral" flows are not jurisdictional under the CWA.  *Id.* at 733-34.

### iii.   Connection to Traditional Interstate Navigable Waters

Under the Plurality test, relatively permanent nonnavigable waters are not jurisdictional unless they are "connected to traditional interstate navigable waters," *id.* at 742, and, as in the case of wetlands, the connection must be a "continuous surface water connection," so if the hydrological connection is subsurface, or if the surface connection is interrupted, the nonnavigable water is not jurisdictional.  *Id.* at 742.

---

[12] In his concurring opinion in *Rapanos*, Chief Justice Roberts took the government to task for failing to promulgate formal regulations in the aftermath of the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*SWANCC*), 531 U.S. 159 (2001).  *Rapanos*, 547 U.S. at 757-58 (Roberts, C.J., concurring).  The Chief Justice stated that, had the government promulgated regulations post-*SWANCC*, it would have "enjoyed plenty of room" in defining the reach of CWA regulation.  *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring).  It is incomprehensible why the government failed to promulgate regulations after *Rapanos* and, instead, opted to produce a guidance document that by its own terms has no legal effect on the regulated community and is not entitled to any deference by this Court.

### b.   Wetlands

For wetlands, the *Rapanos* Plurality set forth a distinct two-part test to determine CWA jurisdiction.  First, the wetland must have a "continuous surface connection" to another jurisdictional water.  *Id.* at 742.  Second, the connection between the wetland and the water must be such as to "mak[e] it difficult to determine where the 'water' ends and the 'wetland' begins."  *Id.*  Hence, a wetland is not jurisdictional if its hydrological connection to a waterbody is subsurface at any point, or if the boundary between the wetland and the waterbody is not difficult to discern.  Citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985), the Plurality insisted on this linedrawing test because of its concerns that the government was asserting jurisdiction over vast stretches of land throughout the nation that could not under any reasonable view be considered "waters."  The Plurality stated that only in those circumstances where one could not tell where the water ends and where the land begins should any land, including wetland, be considered jurisdictional water under the CWA.  *Rapanos*, 547 U.S. at 742 ("Therefore, *only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act.").  Indeed, the Plurality states that wetlands can be considered waters only "if they [are] . . . as a practical matter *indistinguishable* from  waters of the United States."  *Id.* at 755.  The Plurality states further that wetlands are jurisdictional only if they are "'adjacent' to . . . 'waters' in the sense of possessing a continuous surface connection that creates the boundary-drawing problem we addressed in *Riverside Bayview*."  *Id.* at 757.

### 3.  The Kennedy Test

For nonnavigable waters and their related wetlands, the Kennedy test involves a different set of fact-intensive and site-specific issues.

### a. Wetlands

### i. The "Significant Nexus" Test

Under the Kennedy test, CWA jurisdiction over wetlands depends upon the existence of a "significant nexus between the wetlands in question and navigable waters in the traditional sense."[13] Wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if they, either alone or in combination with similarly situated lands in the region, "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable."[14]   On the other hand, when wetlands' effects on water quality are "speculative or insubstantial," they do not have a significant nexus to navigable waters because "they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"[15] Importantly, "[a]bsent more specific regulations . . . the Corps must establish a significant nexus on a *case-by-case basis* when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries.  Given the potential overbreadth of the Corps' regulations, this showing is necessary to avoid unreasonable applications of the statute."[16]

Thus, because the government has not established more specific regulations since *Rapanos*, "significant nexus" under the Kennedy test must be established by the government on a case-by-case basis when the government asserts that a wetland adjacent to a nonnavigable tributary is jurisdictional.

---

[13] 547 U.S. at 779.

[14] 547 U.S. at 780.

[15] 547 U.S. at 780.

[16] 547 U.S. at 782 (emphasis added).

### ii. Substantial Evidence, Speculation, and Site-Specific Data

Referring to the *Carabell* facts, the Kennedy test addresses the meaning of the terms "speculation" and "substantial evidence" by stating that "conditional language" in expert opinions regarding wetlands functions and values, such as "potential ability" and "possible flooding":

> suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims, see 5 U.S.C. § 706(2)(E).[17]

The citation to the Administrative Procedure Act's ("APA's") substantial evidence standard requires a court to ask whether a "reasonable mind might accept" a particular evidentiary record as "adequate to support a conclusion,[18] and the issue must be viewed in the light that the record in its entirety furnishes (including the body of evidence opposed to the government's view).[19]  It requires a determination of whether the position of the government is reasonable under the circumstances,[20] and requires that a court engage in a careful review of the "worth" of those testifying in a particular case.  In addition, evidence is not substantial if it constitutes mere conclusion,[21] even those of experts, and conclusions, without more, cannot sustain a finding that substantial evidence exists.[22]

In joining in the remand of the consolidated cases to the lower court, Kennedy stated that a court must determine

whether the *specific wetlands at issue* possess a significant nexus with navigable

---

[17] *Rapanos*, 547 U.S. at 786.

[18] *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

[19] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

[20] 340 U.S. at 490.

[21] *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

[22] 966 F.2d at 1375 ("Dr. Dingle's brief, conclusory opinion is not supported by any medical evidence.").

waters.[23]

The emphasized language indicates that, in those instances where wetlands are not adjacent to a navigable-in-fact water, "the specific wetlands at issue" in any given case must be shown by the government to have a significant nexus to a navigable water on a "case-by-case basis."[24]   This requires "substantial"[25] site specific-data showing that the physical, chemical, and biological relationship between the "specific wetlands at issue" and a navigable-in-fact water is significant and is not based on speculation or conjecture.

### b.  Nonnavigable Waters

Justice Kennedy did not devote a substantial portion of his opinion to the issue of when nonnavigable waters themselves are jurisdictional under the CWA.  However, in citing approvingly the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*SWANCC*),[26] Justice Kennedy stated:

> [A] water *or* wetland must possess a "significant nexus" to waters that are or were navigable in fact or that could reasonably be made so.[27]

Thus, Kennedy's significant nexus test applies both to nonnavigable waters and to wetlands adjacent to nonnavigable waters.[28]

---

[23] *Rapanos*, 547 U.S. at 787 (emphasis added).

[24] *Rapanos*, 547 U.S. at 782.

[25] *Rapanos*, 547 U.S. at 786.

[26] 531 U.S. 159 (2001).

[27] *Rapanos*, 547 U.S. at 759 (emphasis added).

[28] As for wetlands adjacent to navigable waters, Justice Kennedy stated that "[w]hen the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction."  *Rapanos*, 547 U.S. at 782.  However, Justice Kennedy gave the term "adjacent" its ordinary meaning, as abutting, using *Riverside Bayviews*' abutting wetlands as the proper application
(continued...)

### c. Inseparably Bound Up with Waters of the United States

In *United States v. Riverside Bayview Homes, Inc.*,[29] the Supreme Court stated that CWA jurisdiction may extend to wetlands "inseparably bound up with the 'waters' of the United States."[30] In *SWANCC*, the Court stated that *Riverside* extended jurisdiction to wetlands adjacent to navigable waters because such wetlands were "'inseparably bound up with "waters" of the United States'"[31] and, consequently, had the requisite significant nexus to make such wetlands jurisdictional. By citing *SWANCC* approvingly on this issue, Mr. Justice Kennedy signals that wetlands adjacent to nonnavigable waters are jurisdictional under the significant nexus test only if such wetlands are "inseparably bound up with" navigable waters.

### d. Summary of the Kennedy "Significant Nexus" Standard

Based on the foregoing, under the Kennedy test a wetland adjacent to a nonnavigable water is jurisdictional only if it has a significant nexus to a navigable water. A wetland adjacent to a nonnavigable water meets the significant nexus test only if either alone or in combination with "similarly situated lands in the region" it significantly affects the chemical, physical, and biological integrity of a navigable water. Nonnavigable waters themselves are not jurisdictional unless they significantly affect the chemical, physical, and biological integrity of navigable waters.[32]

Nonnavigable waters and their adjacent wetlands do not meet the significant nexus test and, therefore, are not jurisdictional, if their effects on the water quality of navigable waters are

---

[28] (...continued)
of the adjacency standard. *See id.* at 774-82.

[29] 474 U.S. 121 (1985).

[30] 474 U.S. at 134.

[31] 531 U.S. at 167 (quoting *Riverside*, 474 U.S. at 134).

[32] *Rapanos*, 547 U.S. at 759, 778.

(1) speculative, (2) insubstantial, (3) not based on data specific to the waters or wetlands at issue, (4) insignificant in relation to the navigable water, or (5) not based on "substantial evidence."  In addition, wetlands adjacent to nonnavigable waters are not jurisdictional unless they are inseparably bound up with navigable waters.

### e. "Similarly Situated Lands in the Region"

In the Post-*Rapanos* Guidance, EPA and the Corps of Engineers intended to provide EPA regions and the Corps of Engineers' districts with guidelines which address the extent of CWA jurisdiction over waters of the Untied States.[33]  Although the Post-*Rapanos* Guidance states that it does not impose legally binding requirements, a federal administrative agency must follow its own rules and regulations,[34] as well as internal guidance prepared for agency personnel,[35] even if the regulated community is not bound thereby.[36]

Among other things, the Post-*Rapanos* Guidance addresses the two agencies' views of the meaning of the term "similarly situated lands in the region" in Justice Kennedy's concurring opinion.  The Post-*Rapanos* Guidance approaches the term in two steps.  First, it addresses the

---

[33] Post-*Rapanos* Guidance at 1.

[34] *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1830 (2009) ("The agency must follow its own rules.").

[35] *United States v. Caceres*, 440 U.S. 741, 752 n.14 (1979) ("'Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so even where the internal procedures are possibly more rigorous than otherwise would be required.'") (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

[36] *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (1st Cir. 1996) ("[D]eference is inappropriate when an agency's conclusion rests predominantly upon its reading of judicial decisions."); *see, e.g.*, *Director, Office of Workers' Comp. Programs v. Gen. Dynamics Corp.*, 980 F.2d 74, 78-79 (1st Cir. 1992) (no deference accorded to administrative interpretation of a judicially created doctrine).

"reach" of nonnavigable tributaries and, second, it defines similarly situated wetlands adjacent to such tributaries.

> A tributary . . . is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream.)[37]

> . . . [T]he agencies will consider the flow and functions of the tributary together with the functions performed by all the wetlands adjacent to that tributary in evaluating whether a significant nexus is present.  Similarly, where evaluating significant nexus for an adjacent wetland, the agencies will consider the flow characteristics and functions performed by the tributary to which the wetland is adjacent along with the functions performed by the wetland and all other wetlands adjacent to that tributary.  This approach reflects the agencies' interpretation of Justice Kennedy's term "similarly situated" to include all wetlands adjacent to the same tributary.  Where it is determined that a tributary and its adjacent wetlands collectively have a significant nexus with traditional navigable waters, the tributary and all of its adjacent wetlands are jurisdictional.[38]

Thus, in interpreting the term "similarly situated lands in the region," with regard to wetlands adjacent to nonnavigable tributaries, the Post-*Rapanos* Guidance defines the term to include only those wetlands that are adjacent to that portion of the reach of a stream that is "of the same order."  In the parlance of wetlands experts, this is referred to as the "relevant reach."  Shamas Remand Decl. ¶¶ 74-75

## C.    Pre-Disturbance Conditions

In relevant part, the CWA prohibits "the discharge of any pollutant by any person" except in compliance with certain specific provisions of the CWA, 33 U.S.C. § 1311(a), and "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  In turn, "navigable waters" is defined in relevant part as "the waters of the United States."  Thus, the CWA prohibits pollutant discharges to those geographic features referred

---

[37] Post-*Rapanos* Guidance at 6 n.24.

[38] Post-*Rapanos* Guidance at 10.

to as "waters of the United States."  Accordingly, for a pollutant discharge to be illegal under the

CWA, the geographic feature into which the discharge is made must qualify as a part of "the waters

of the United States," and must be a jurisdictional water or wetland at the time the discharge is

made.  It is irrelevant whether the water or wetland becomes jurisdictional after the discharge occurs

because the discharge must be into a jurisdictional water or wetland.  Therefore, in order to succeed

in an enforcement action under the CWA, the government must show that the water or wetland into

which a discharge was made was jurisdictional at the time of the discharge.[39]  As with other federal

enforcement actions, such a showing must be made by a preponderance of the evidence.[40]

## D.     Wetlands Adjacent to Wetlands

### 1.     The Regulatory Exclusion and "Adjacency"

EPA and the Corps of Engineers have promulgated nearly identical regulations governing

wetlands' jurisdictional and permitting issues.[41]  The regulations provide a detailed section of

definitions of terms.[42]  Of particular significance is the definition of the term "waters of the United

---

[39] *United States v. Brace*, 41 F.3d 117, 120 (3d Cir. 1994) (To establish the existence of a violation under the CWA, it must be established that the discharge was made into wetlands, and that those wetlands "constituted waters of the United States at the time of defendant's activities."); *see also United States v. Acquest Transit LLC*, No. 09-CV-055S, 2009 U.S. Dist. LEXIS 60337, at *3 (W.D.N.Y. July 15, 2009).

[40] *Nat'l Indep. Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388 (1976) (Bureau of Mines, represented by the Office of the Solicitor, had the burden of proving civil penalties by a preponderance of the evidence.); *see also United States v. Alcon Labs.*, 636 F.2d 876, 883 (1st Cir. 1981) (in an enforcement action FDA must allege sufficient facts to state a claim and must then prove its claim by a preponderance of the evidence).

[41] 40 C.F.R. § 230, *et seq.* (EPA); 33 C.F.R. § 328, *et seq.* (Corps).  For ease of reference, the remainder of this brief will refer primarily to the EPA regulatory codification citations.

[42] 40 C.F.R. § 230.3; 33 C.F.R. § 328.3.

States," which sets forth the various geographic features that qualify as jurisdictional waters.[43]  The

relevant portion of the regulation provides:

> The term waters of the United States means:
>
>     . . . .
>
>     (7)  Wetlands adjacent to waters (other than waters that are themselves
>     wetlands) identified in paragraphs (s)(1) through (6) of this section . . . .[44]

Sections (s)(1) through (6) set forth a variety of waters considered "waters of the United States,"

including navigable waters.[45]  Thus, the regulations provide for an exclusion from the definition of

the term "waters of the United States" for wetlands adjacent to wetlands.[46]

At first blush, the regulatory exclusion appears clear.  A wetlands adjacent to another

wetland that is not also adjacent to any other waters of the United States is not within the definition

of the term "waters of the United States," and therefore is not jurisdictional.  Although EPA's

regulations do not define the term "adjacent," the Corps' regulations do, as follows:

> The term *adjacent* means bordering, contiguous, or neighboring. Wetlands separated
> from other waters of the United States by man-made dikes or barriers, natural river
> berms, beach dunes and the like are "adjacent wetlands."[47]

Under this broad regulatory definition of adjacency, a wetland merely "neighboring" a jurisdictional

water is not excluded from jurisdiction by virtue of 33 C.F.R. § 328.3(c).  What constitutes

"neighboring" is not defined in the regulations, although the Corps, EPA and some pre-*Rapanos*

case law interpret the term broadly to mean simply being in the neighborhood of a jurisdictional

---

[43] 40 C.F.R. § 230.3(s); 33 C.F.R. § 328.3(a).

[44] 40 C.F.R. § 230.3(t)(7); 33 C.F.R. § 328.3(a)(7).

[45] 40 C.F.R. § 230.3(s)(1); 33 C.F.R. § 328.3(a)(1).

[46] 40 C.F.R. § 230.3(s)(7); 33 C.F.R. § 328.3(a)(7).

[47] 33 C.F.R. § 328.3(c).

water.[48]

## 2. The Plurality Opinion Rejects the Regulatory Definition of "Adjacent"

The regulatory definition of adjacency as set forth in 33 C.F.R. § 328.3(c), and as applied by the government, was explicitly rejected by the *Rapanos* Plurality.[49]  Under the Plurality test, *only* wetlands that are "as a practical matter *indistinguishable* from waters of the United States," 547 U.S. at 755, are covered by the Act.  This standard of indistinguishability necessarily applies to boundaries between wetlands as well as to boundaries between wetlands and waters.  As set forth in more detail below, if one type of wetland abuts another type of wetland but does not itself abut open water, the first wetland is adjacent to the second wetland but is not adjacent to the open water, under the Plurality test.  Thus, if the wetlands are distinguishable from each other, the wetlands-adjacent-to-wetlands regulatory exclusion would apply to the wetland that does not directly abut open water.  In this way, the Corps' regulatory definition of adjacency to include wetlands "in the neighborhood" of waters should be given no effect under the Plurality test.

## 3. The Kennedy Concurring Opinion Requires a Probing Case-by-Case Inquiry as to Whether Any Particular Wetland Is "Adjacent" to a Body of Open Water

Applying the Kennedy test to the wetlands-adjacent-to-wetlands exclusion requires a different analysis.  Like the Plurality, Justice Kennedy gave the term "adjacent" only its ordinary meaning—as "abutting."[50]  To give meaning to the wetlands-adjacent-to-wetlands exclusion in connection with the Kennedy test requires every wetland that is not "adjacent" to a navigable-in-fact

---

[48] *See, e.g.*, *Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150, 1152, 1157 (9th Cir. 2005).

[49] 547 U.S. at 741-42 & n.10.

[50] *See Rapanos*, 547 U.S. at 774-82.

water to undergo the test on a case-be-case basis.  Thus, if all wetlands "in the neighborhood" of a nonnavigable tributary must undergo the significant nexus test as part of a wetland *system* adjacent to that tributary, then the exclusion for wetlands-adjacent-to-wetlands becomes meaningless.  To give meaning to the exclusion, the Kennedy test requires that wetlands be classified to determine which are subject to the test and which are not because they meet the regulatory exclusion.  As described by Defendants' wetlands science expert, "if an Emergent type wetland abuts open water located on its western edge and is itself abutted by a Forested type wetland located on its eastern edge then the Emergent wetland is adjacent to the open water but the Forested wetland is not because the Emergent wetland separates the Forested wetland from the open water."  Shamas Remand Decl. ¶ 26.

Without classifying each wetland according to wetland type, the exception for wetlands-adjacent-to-wetlands under the government's current interpretation of the term "neighboring" in the regulations would be meaningless.  Under the current government interpretation, every wetland that does not abut open water would nevertheless be deemed adjacent to open water if it simply abutted another wetland that itself abutted open water, leaving no room for the application of the regulatory exception.  The only way to give meaning to the regulatory exception under the Kennedy test is to separate the wetlands by wetland type.  As stated by the Supreme Court, courts will not give an agency's interpretation of its regulations deference when that interpretation is inconsistent with the regulations themselves.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

This has implications also in connection with the aspects of the Kennedy test dealing with aggregating wetland functions among "similarly situated lands in the region."  In the example using an Emergent wetland adjacent to a Forested wetland, wetlands science principles allow that the Emergent wetland's chemical, physical, and biological functions may be aggregated with the

functions of other Emergent wetlands in the region to determine whether, in the aggregate, such Emergent wetlands have a significant chemical, physical, and biological nexus to a navigable water. If they do, the Emergent wetland is jurisdictional. If they do not, the Emergent wetland is not jurisdictional. The same principles are applied separately by wetlands scientists to the Forested wetland and other Forested wetlands within the "relevant reach," under the Post-*Rapanos* Guidance. Without distinguishing among wetland types, aggregating wetland functions in the region is not scientifically feasible or defensible because there would be no way to determine which lands in the region are "similarly situated" under the Kennedy test. *See* Shamas Remand Decl. ¶¶ 15-43.

## E.     There Can Be No Liability Under the CWA Without a Discharge

The CWA prohibits discharges of pollutants. 33 U.S.C. § 1311(a). The Act defines "discharge of a pollutant," in relevant part, as "any *addition* of any pollutant to navigable waters." 33 U.S.C. § 1362(12) (emphasis added). After extensive litigation,[51] the Corps of Engineers promulgated final regulations redefining the term "discharge of dredged material" to make clear that "incidental fallback" of dredged material into jurisdictional waters was excluded from the definition of "discharge of dredged material." *See* 33 C.F.R. § 323.2(d); *see also* 73 Fed. Reg. 79,641, 79,643-44 (Dec. 30, 2008). The regulations were amended to ensure they conformed to court decisions holding that the CWA only prohibits discharges and not dredging *per se*. 73 Fed. Reg. at 79,643-44. Accordingly, to hold Defendants liable under the CWA, the government must show that dredged material was discharged into jurisdictional waters or wetlands, not merely that such waters or wetlands were dredged, and the government must prove such discharges at trial by a preponderance

---

[51] *See Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 951 F. Supp. 267 (D.D.C. 1997); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 311 F. Supp. 2d 91 (D.D.C. 2004); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459 (D.C. Cir. 2006); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, No. 01-0274, 2007 U.S. Dist. LEXIS 6366 (D.D.C. Jan. 30, 2007).

of the evidence.[52]

## F.     Navigability

The term "traditional navigable waters" was not commonly used prior to the 1970s.  *See*

William W. Sapp, et al., *The Float a Boat Test*, 38 Envtl. L. Rep. News & Analysis 10439, 10443

(2008).  Its use arose out of Congress's contemplated amendments to the CWA, which expanded the

definition of "navigable waters" beyond that term's traditional meaning.  *See id.*  The term is

important under *Rapanos* because both the Scalia and Kennedy tests use the existence and location

of navigable waters as an important analytical reference point for determining whether a given

nonnavigable tributary or wetland is regulable under the CWA.  *See Rapanos*, 547 U.S. at 730-32

(Plurality opinion); *id.* at 782 (Kennedy, J., concurring).

The phrase "navigable in fact" waters has a long and well-established use, developed under

three general categories:  the authority of the federal government over interstate commerce; federal

courts' admiralty jurisdiction; and the determination of ownership of streambeds of navigable

waters.  *See, e.g.*, Richard M. Frank, *Forever Free:  Navigability, Inland Waterways, and the*

*Expanding Public Interest*, 16 U.C. Davis L. Rev. 579, 582-83 (1983).  The precise meaning of

navigable-in-fact depends upon the category for which the phrase is used.  *See* Sapp, *supra*, at

10444.  Under the Commerce Clause, a water is navigable-in-fact if it is, or ever was, or could with

reasonable improvements be made to be, navigable such that it can or could serve by itself as, or as

an unbroken link in, an aquatic interstate commercial highway.  *See United States v. Appalachian*

*Elec. Power Co.*, 311 U.S. 377, 407-09 (1940).

---

[52] *Nat'l Indep. Coal Operators Ass'n v. Keppe*, 423 U.S. 388 (1976) (Bureau of Mines, represented by the Office of the Solicitor, had the burden of proving civil penalties by a preponderance of the evidence); *see also United States v. Alcon Labs.*, 636 F.2d 876, 883 (1st Cir. 1981) (in an enforcement action FDA must allege sufficient facts to state a claim and must then prove its claim by a preponderance of the evidence).

The Commerce Clause test of navigability is the one that must be applied here because (1) the CWA was enacted pursuant to Congress's power over navigable waters, *SWANCC*, 531 U.S. at 172 (citing *Appalachian Elec. Power Co.*), and (2) both the Plurality and Kennedy tests incorporate the phrase's traditional Commerce Clause-based meaning, *see Rapanos*, 547 U.S. 730-31 (Plurality opinion); *id.* at 760-61 (Kennedy, J., concurring).   According to that traditional Commerce Clause meaning, it is not enough that the water simply be navigable (which is sufficient for federal title purposes); rather, as noted above, the water must be serviceable as a highway for interstate commerce.  *See* Thomas F. Linn, Note, *Deficiencies in the Regulatory Scheme of the Federal Water Pollution Control Act Amendments of 1972*, 19 St. Louis U. L.J. 208, 211-12 (1974); William W. Sapp, et al., *From the Fields of Runymede to the Waters of the United States:  A Historical Review of the Clean Water Act and the Term "Navigable Waters,"*  36 Envtl. L. Rep. News & Analysis 10190, 10191 (2006).  Although interruptions in the flow of the water, such as dams or locks, do not denationalize an otherwise regulable waterbody, *see Sierra Pac. Power Co. v. FERC*, 681 F.2d 1134, 1139 (9th Cir. 1982), if the portage required is significant, then the waterbody, though navigable, may not qualify as a navigable water of the United States, *see id.*; (*cf. Kaiser Aetna v. United States*, 444 U.S. 164 (1979), where the Supreme Court assumed that a fishing pond navigable by shallow-bottomed boats adjacent to a fully navigable bay would not constitute waters of the United States, *see id.* at 178-79).

Under the traditional Commerce Clause navigability analysis, what matters is whether the water can be used as a highway for commerce.  Accordingly, evidence of past commercial use is important, *see, e.g.*, *United States v. Fabian*, 522 F. Supp. 2d 1078, 1092 (N.D. Ind. 2007).  *See also* William L. Sapp, et al., *The Historical Navigability Test:  How to Use It to Advantage in This Post-Rapanos World*, 37 Envtl. L. Rep. News & Analysis 10797, 10798, 10802-03 (2007), although

evidence of recreational use can also be probative of the water's potential for commercial use.  *See FPL Energy Maine Hydro LLC v. FERC*, 287 F.3d 1151, 1157 (D.C. Cir. 2002).  Tthe Federal Energy Regulatory Commission has developed a jurisprudence of traditional navigability that focuses upon the "canoe test":  if a canoeist can navigate the stream, then that is sufficient evidence of the stream's susceptibility to use as an avenue of commerce.  *See PacifiCorps Elec. Operations*, 73 FERC ¶ 61,365, at *4 (1995).  *See generally* Richard J. Pierce, Jr., *Canoes Count but Kayaks Do Not*, 53 Syr. L. Rev. 1067 (2003).  In contrast, evidence of navigation by a kayak is insufficient because waters that can be navigated only by kayak are not easily susceptible to commercial use.  *See PacifiCorps*, 73 FERC ¶ 61,365, at *62,141 n.26.

Thus, for the government to assert that any portion of the Weweantic River qualifies as a traditional navigable water, for purposes of the *Rapanos* tests, the government must show that (1) the waterbody is navigable by at least a canoe, and (2) that the waterbody serves as a segment in interstate aquatic commerce.  Although the necessity of portage does not inevitably defeat federal control, it can, depending upon the extent to which portage is necessary.

# ARGUMENT

# I

## THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED UNDER THE *RAPANOS* PLURALITY TEST

**A.   Cross Street Site**

**1.   None of the Wetlands or Waters on the Cross Street Site Is Jurisdictional Under the *Rapanos* Plurality Test**

In the pre-remand phase of this litigation, the government alleged that the Defendants discharged dredge or fill material into certain wetlands on the Cross Street Site.  First Am. Compl. ¶¶ 35-41, reproduced in Defs Mot. Ex. 6 at 051-52.  For a wetland to be jurisdictional under the *Rapanos* Plurality test, it must be difficult to distinguish the wetland from an abutting jurisdictional water.  *See Rapanos*, 547 U.S. at 742 (Plurality opinion).  Because all of the alleged wetlands at the Cross Street Site were always readily distinguishable from any arguably jurisdictional nonnavigable water, none of the wetlands at the site were jurisdictional.

**a.   Beaver Dam Brook and Its Abutting Wetlands Are Not Jurisdictional**

Beaver Dam Brook is a nonnavigable stream that flows through the southwestern portion of the Cross Street Site.  *See* Defs Mot. Ex. 7 at 059.  Any wetlands abutting Beaver Dam Brook have at all times been clearly distinguishable from the Brook itself. Mr. Anderson, the Defendants' expert photogrammetist, reviewed numerous aerial photographs spanning over five decades from 1952 to 2001 depicting the Brook and stated:  "With respect to every photograph I reviewed depicting Beaver Dam Brook, I was able clearly to distinguish between the Brook and its abutting wetlands."  Anderson Remand Decl. ¶ 98.  *See also* Anderson Supplemental Report, Volume 1 of 3, dated October 9, 2009 (the "Anderson Cross St. Sup. Rpt"), reproduced in Defs Mot. Ex. 8 at 096.

Mr. Peter Stokely, the government's expert photogrammetist, agreed and stated during his deposition on January 16, 2009, that, with reference to pre-disturbance aerial photography taken in 1960, he saw a distinct channel in which Beaver Dam Brook was flowing through the Cross Street Site, that the edges of the channel were clearly defined, and that he could clearly see where the water ends and where the wetlands begin as Beaver Dam Brook flows through the Cross Street Site.  *See* Stokely 1/16/09 Dep. at 202-12, reproduced in Defs Mot. Ex. 9 at 145-55.  Defs' SOF ¶ 125.  Thus, the experts on both sides agree that there is no problem in determining the on-site water/wetland boundary of Beaver Dam Brook.

Mr. Anderson observed in his February, 2009, Report that the land/water edge of Beaver Dam Brook was clear for every date of photography where Beaver Dam Brook was visible. Anderson Report dated February 4, 2009 (the "Anderson February, 2009, Report") at 41, reproduced in Defs Mot. Ex. 10 at 198; *see also* Anderson October, 2009, Supplemental Report, Volume 1 of 3 for the Cross Street Site (the "Anderson October, 2009, Cross Street Site Supplemental Report," at 2, 7, 14, 15, 17, 20, 21, 23, 25, 26, 28, 30, 31, 33, 35, 36, reproduced in Defs Mot. Ex. 8 at 061-96.

The government has offered no substantial evidence showing that the wetlands are indistinguishable from the waters at the Cross Street Site.  While its brief makes the bare assertion that water flow occasionally left Beaver Dam Brook indistinguishable from some wetlands at the Cross Street Site,  it is uncontroverted that the photographic evidence spanning a 50-year period shows that Beaver Dam Brook and the abutting site wetlands in pre-alteration conditions were clearly distinguishable from each other.  Anderson Remand Decl. ¶ 98.  Moreover,  because the wetlands at the Cross Street Site are within the Palustrine System, they would have had little surface flow through them.  Shamas Remand Decl. ¶ 23.  Rather, surface water would either pond or evaporate, be used by vegetation within the wetland (and be lost through a process known as

evapotranspiration), or simply sink subsurface to become groundwater. Haydock Remand Decl. ¶¶ 67-69. In addition, the largest wetlands at the site have been designated as "isolated" or "flat" and, therefore, had no surface water connection to Beaver Dam Brook under pre-alteration conditions. Anderson Remand Decl. ¶ 36. The only possible surface water connection between site wetlands and Beaver Dam Brook was in the relatively small area designated as the Beaver Dam Brook Floodplain. Defs' SOF ¶ 197; *see* Defs Mot. Ex. 7 at 059. Even in such an area, it is uncontroverted that for every date of photography spanning a period of 50 years there is no problem in distinguishing Beaver Dam Brook from the floodplain in pre-alteration conditions at the Cross Street Site and, contrary to the government's assertions, none of the Defendants' experts admitted that the Brook at the Cross Street Site was indistinguishable from any wetlands. Thus, the government provides no substantial evidence that there is any linedrawing problem with regard to any wetlands arguably abutting Beaver Dam Brook. Consequently, there is no genuine issue of material fact regarding this issue. *In re Spigel*, 260 F.3d at 31.

Therefore, none of the wetlands that even arguably abutted Beaver Dam Brook are jurisdictional under pre-alteration conditions because the Brook and the site wetlands are clearly distinguishable, and the expert photgramatrists on both sides agree on this point. Defs' SOF ¶ 125. Consequently, (1) the Defendants are entitled to summary judgment on all allegations of discharge activity into any and all of the wetlands at the Cross Street Site that arguably abutted Beaver Dam Brook, and (2) the Plaintiff's motion with regard to such wetlands should be denied.

With regard to alleged discharges into Beaver Dam Brook, Plaintiff's pre-remand motions for summary judgement, including the SOFs therein, offer no evidence of any discharge into the Brook. Defs' SOF ¶¶ 123-124. At most, Plaintiff's remand brief describes the Defendants' activities regarding the Brook as "altering and/or filling" it. Of course, there is a big difference between the

two.  There can be no liability under the CWA without a discharge.  33 U.S.C. § 1362(12); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459 (D.C. Cir. 2006); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, No. 01-0274, 2007 U.S. Dist. LEXIS 6366 (D.D.C. Jan. 30, 2007).  The government's own evidence does not show discharges into Beaver Dam Brook by the Defendants.  *See* Defs Mot. Ex. 11 at 208, reproducing first page of Gov't Motion Exhibit 6, 123-7, page 1 of 3 (Beaver Dam Brook is not colored in red); *see also* Gov't Third SOF at 3. Therefore, (1) the Defendants are entitled to summary judgment on all allegations of discharge activity into Beaver Dam Brook, and (2) the Plaintiff's motion with regard to Beaver Dam Brook should be denied.

In addition, there is evidence in the record that Beaver Dam Brook was not a relatively permanent water under pre-alteration conditions Haydock 5/22/09 Dep. at 237 (raising issue that Beaver Dam Brook was not a perennial stream); Defs' SOF ¶ 187.  *See* Exhibit Page A9 of Anderson's Remand Declaration (1977 U.S.G.S. map showing Beaver Dam Brook terminating before reaching the southern end of the Cross Street Site), as well as Anderson Exhibit Page A10 (1944 Plympton map showing Beaver Dam Brook as a dotted line, indicating an intermittent or ephemeral stream, and terminating before reaching the southern end of the Cross Street Site).  *See also* Defs Mot. Ex. 12 at 210-11, depicting Beaver Dam Brook on two separate pre-alteration dates as terminating before leaving the site.  Therefore, there is a genuine issue of material fact regarding whether the Brook is a relatively permanent water and, for this reason also, Plaintiff's motion should be denied under the Plurality test with regard to any allegations involving discharges to Beaver Dam Brook.

**b.  The Unnamed Tributary and Its**
**Abutting Wetlands Are Not Jurisdictional**

**i.   The Short Segment of the Unnamed**
**Tributary Is Not Jurisdictional Under the Plurality Test**

Only a short unnamed tributary approximately 500 feet in length is drawn on a 1941 USGS topographic map of the Cross Street Site. Defs Mot. Ex. 12 at 210. Defs' SOF ¶ 126. Mr. Stokely admits that this short segment may be a man-made drainage ditch. Stokely 1/16/09 Dep. at 189 ("Q. Is it possible that the blue line represents a man-made drainage ditch? A. Yes."). Mr. Anderson characterizes the short segment as man-made. *See* Anderson Decl. ¶¶ 32, 101 ("The line depicting the short segment of the unnamed tributary is relatively straight, so, if the short segment existed at the time, its straight-lined shape would suggest that it was a man-made excavated drainage ditch intended to drain an area represented by swamp symbols."); *see also* Def's SOF ¶ 127. Indeed, Plaintiff has neither alleged nor provided any credible evidence that the short segment is a naturally occurring geographic feature. *See id.* ¶ 128. Under the *Rapanos* Plurality, a relatively permanent waterbody does not include those waters that are man-made, because man-made waters are not referred to in common parlance as streams or rivers but rather as, for example, canals or ditches. 547 U.S. at 133-34. There is no material dispute as to the man-made origin of the short segment. Because the government has failed to meet its burden that the short segment is a naturally occurring geographic feature, there is no genuine issue of material fact that the short segment is anything other than man-made. *In re Spigel*, 260 F.3d at 31. Therefore the short segment is not jurisdictional under the CWA, and (1) the Defendants are entitled to summary judgment on any allegation of discharge activity in the short segment, and (2) the Plaintiff's motion with regard to allegations of discharge activity in the short segment should be denied.

### ii. The Extended Segment of the Unnamed Tributary Is Not Jurisdictional Under the Plurality Test

A lengthened tributary is visible for the first time on the 1973 aerial photograph.[53]   *See* Ex. 10 at 35, 39.   Mr. Stokely stated that the unnamed tributary, extending from the Brook and terminating at the northeastern reservoir, was a drainage feature.   Stokely 1/16/09 Dep. at 187-90. Mr. Anderson concluded that the entire unnamed tributary is man-made, including its extended section.   Anderson Remand Decl. ¶ 48.   The unnamed tributary does not appear on the 1985 aerial photograph of the site.   Anderson Remand Decl. ¶ 68.   Plaintiff's expert photogramatrist admits that the unnamed tributary may be a man-made waterway.   Defs' SOF ¶ 134.   Under the *Rapanos* Plurality, a relatively permanent waterbody does not include those waters that are man-made, because man-made waters are not referred to in common parlance as streams or rivers but rather as, for example, canals or ditches.   547 U.S. at 133-34.   There is no material dispute as to the man-made origin of the extended segment of the unnamed tributary.   Because the government has failed to meet its burden that the extended segment is a naturally occurring geographic feature, there is no genuine issue of material fact that the extended segment is anything other than man-made.   *In re Spigel*, 260 F.3d at 31.   Therefore the extended segment is not jurisdictional under the CWA, and (1) the Defendants are entitled to summary judgment on any allegation of discharge activity in the extended segment, and (2) the Plaintiff's motion with regard to allegations of discharge activity in the extended segment should be denied.

---

[53] Although Mr. Stokely depicts the tributary as fully visible on the 1960 photograph, he simply took an outline of the tributary developed from later photographs, which he superimposed onto the 1960 photograph.   Stokely 1/16/09 Dep. at 197 ("That blue line represents how I interpret the drainage path, by the way, from the 1973 era photograph, superimposed back to the older one.").

### iii.  The Unnamed Tributary Is Not Jurisdictional Because It Is Not Otherwise a Relatively Permanent Water

The unnamed tributary was a temporary, man-made ditch.  It was used for the specific and sole purpose of draining the isolated wetland area in the northern portion of the Cross Street Site for agricultural purposes.  Anderson Remand Decl. ¶ 51. As such, it was not a relatively permanent water feature.  *Id.*  Under the Plurality test, only relatively permanent waters are jurisdictional. *Rapanos*, 547 U.S. at 739, 742. The government has not shown that the unnamed tributary was used for any purpose other than as a temporary drainage feature.  Because the government has failed to meet its burden of showing that the unnamed tributary is a relatively permanent water, there is no genuine issue of material fact that the unnamed tributary is anything other than a temporary drainage ditch.  *In re Spigel*, 260 F.3d at 31. Therefore the unnamed tributary is not jurisdictional under the CWA, and (1) the Defendants are entitled to summary judgment on any allegation of discharge activity in the unnamed tributary and (2) the Plaintiff's motion with regard to allegations of discharge activity in the unnamed tributary should be denied.

In the alternative, at the very least, Defendants have raised a genuine issue of material fact that the unnamed tributary is not a relatively permanent water and, therefore, Plaintiff's motion regarding discharges into the unnamed tributary should be denied.

### iv.  All Wetlands Abutting Any Portion of the Unnamed Tributary Are Clearly Distinguishable from the Unnamed Tributary and Therefore Are Not Jurisdictional

Mr. Anderson opined that one could clearly distinguish the unnamed tributary from its abutting wetlands.  Anderson February 2009 Report at 35, reproduced in Defs Mot. Ex. 10 at 192 ("It is clear on the 1973 aerial photograph where water ends and the land begins along the length of the unnamed tributary.").  *See also* Anderson Remand Decl. ¶ 99 ("With respect to every aerial photograph that I reviewed depicting the unnamed tributary, I was able clearly to distinguish

between the unnamed tributary . . . and its abutting wetlands."); Defs' SOF ¶ 133.  The government

made no attempt to establish any linedrawing problem with respect to any portion of the unnamed

tributary, Defs' SOF ¶ 140.  Moreover, the government has not even raised the issue of flooding as

a possible cause of blurring the land/water edge between the unnamed tributary and any site

wetlands.  Defs' SOF ¶¶ 132, 136-37. Because the government has proffered no evidence that the

unnamed tributary is indistinguishable from its abutting wetlands, such wetlands are not

jurisdictional, *Rapanos*, 547 U.S. at 742, 755, 757, and there is no genuine issue of material fact in

the record on this issue.  *See In re Spigel*, 260 F.3d at 31.  Consequently, (1) the Defendants are

entitled to summary judgment on all allegations of discharge activity into any and all of the wetlands

at the Cross Street Site that even arguably abutted the unnamed tributary, and (2) the Plaintiff's

motion with regard to such wetlands should be denied.

### c.   The Constructed Agricultural Reservoirs and Their Neighboring Wetlands Are Not Jurisdictional

Two agricultural reservoirs were constructed in the northeastern portion of the site.  Ex. 8,

Figures 20-22; Ex. 6 ¶ 35.  The government has neither alleged nor proven discharge activity into

the *reservoirs*; only that their construction involved discharges into jurisdictional wetlands.

However, prior to their construction, the only waters at the site were Beaver Dam Brook and the

unnamed tributary.  As set forth above, none of the wetlands that arguably abutted those waters were

jurisdictional, because there is no line drawing problem.  Consequently, none of the discharges, if

any, associated with the construction of the agricultural drainage ditches could have been discharges

into jurisdictional wetlands, and, therefore, the Defendants could not have incurred any CWA

liability in connection with any such alleged discharges.  *See* Anderson Remand Decl. ¶¶ 63, 69; 74,

79, 89, 94, 100.  Stokely 1/16/09 Dep. at 205-08, reproduced in Defs Mot. Ex. 9 at 148-51.

During the 1980s, an additional agricultural canal and agricultural channel were constructed on the site.  *See* Anderson Remand Decl. ¶ 61.  Around the same time, a small channel was constructed connecting the canal to Beaver Dam Brook.[54]  *Id.*  Again, because the only waterbodies at the Cross Street Site prior to the construction of these agricultural features were Beaver Dam Brook and the unnamed tributary, and because any wetlands abutting the Brook or the tributary were not jurisdictional, none of the alleged discharges into any such wetlands could have been discharges into jurisdictional wetlands.  Therefore, the Defendants could not have incurred any CWA liability in connection with any alleged discharges in connection with the construction of the canal or channel, are entitled to summary judgment in connection therewith, and the Plaintiff's motion regarding such discharges should be denied.

## B.   Fosdick Street Site

### 1.   None of the Alleged Areas of Discharge on the Fosdick Street Site Is Jurisdictional Under the Plurality Test

The government contends that the Defendants graded, excavated, and expanded various areas in and around the site's principal body of open water, the southern reservoir.  The government also contends that the Defendants filled portions of the reservoir's so-called western tributary.  Further, the government asserts violations with respect to the construction of Bog 11, in the site's south-central portion.  Finally, the government alleges that the Defendants excavated an irrigation canal to the west of Bog 11.  Gov't First Amended Complaint ¶¶ 43-48, reproduced in Defs Mot. Ex. 6 at 052-53.  None of the areas in which this alleged discharge activity occurred is jurisdictional under the Plurality test.

---

[54] As indicated, although the government alleged discharges into Beaver Dam Brook in its complaint, it has offered no proof whatsoever, either before or after remand, that any such discharges occurred.  Defs' SOF ¶¶ 123-24.

Prior to alleged disturbance activities on the Fosdick Street Site, a man-made reservoir existed at the southern end of the site. Defs' SOF ¶ 143. *See* Defs Mot. Ex. 14 at 216, which is a reproduction of Figure 16 and its associated text from the Anderson February 2009 Report.

The government's Fosdick Street Site allegations hinge upon the jurisdictional status of the site's main reservoir and its alleged western tributary in the site's north-central portion,[55] because all the areas of alleged violation occurred either in those two bodies of open water, or in wetlands allegedly abutting them. For any of the bodies of open water to be jurisdictional under the *Rapanos* Plurality, they must be natural and not man-made topographic features and they must contain at least seasonal flows. For any of the abutting wetlands to be jurisdictional, they must present the linedrawing problem. *See Rapanos*, 547 U.S. at 732-33, 739, 742 (Plurality opinion).

### a. The Reservoir and Its Abutting Wetlands Are Not Jurisdictional

### i. The Reservoir Is Not Jurisdictional Under the Plurality Test

It is undisputed that the reservoir is a man-made waterbody that existed at least since 1952. Defs' SOF ¶ 143; Anderson Decl. ¶ 110.

Under the *Rapanos* Plurality, a relatively permanent waterbody does not include those waters that are man-made, because man-made waters are not referred to in common parlance as streams or rivers but rather as, for example, canals or ditches. *Rapanos*, 547 U.S. at 739. Because there is no dispute that the reservoir is man-made, it is not jurisdictional, and the Defendants are entitled to summary judgment on any allegations of discharge activity in the reservoir.

---

[55] The reservoir was also fed by a so-called eastern tributary. The government has never come forward with any evidence that the Defendants discharged anything into the eastern tributary or any of its abutting wetlands. There can be no liability under the CWA without a discharge. 33 U.S.C. § 1362(12); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459 (D.C. Cir. 2006); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, No. 01-0274, 2007 U.S. Dist. LEXIS 6366 (D.D.C. Jan. 30, 2007). Thus, Defendants are entitled to summary judgement on all issues regarding the eastern tributary and its abutting wetlands. *In re Spigel*, 260 F.3d at 31.

### ii.   The Wetlands Near the Reservoir

Mr. Anderson reviewed aerial photographs spanning over five decades from 1952 to 2005 depicting the reservoir and its surrounding wetlands, including Bog 11 and the irrigation canal to the west of Bog 11, and stated:  "With respect to every aerial photograph that I reviewed depicting the bodies of open water, I was able clearly to distinguish between the open waters and their abutting wetlands."  Anderson Remand Decl. ¶ 160.  Anderson Supplemental Report, dated October 23, 2009 (the "Anderson Fosdick St. Supp. Rpt."), reproduced in Defs Mot. Ex. 15 at 219.  *See also* Anderson February, 2009, Report, reproduced in Defs Mot. Ex. 10 at 186 ("It is clearly recognizable and straightforward to determine from the aerial photography where the water ends and the land begins.").  Mr. Stokely agreed that predisturbance aerial photography showed a clear land/water edge in connection with the reservoir.  Stokely 1/16/09 Dep. at 170-71; Defs Mot. Ex. 9 at 123-24; ("You can tell by looking at that, you can see the dark-toned signature approximates the extent of water, so where the dark tone ends and the lighter tone begins, that would be the approximate edge of the water.").  Defs' SOF ¶ 145.  Although in his later Remand Declaration, the government's photogramatrist states that the border of the reservoir is "somewhat indistinct where it commingles with wetland vegetation," neither he nor any other government expert points to any specific date of photography spanning a 50-year period that shows that the land/water edge is indistinguishable.  Defs' SOF ¶ 144.  Thus, the government has presented no substantial evidence indicating any linedrawing problem in connection with the reservoir and its abutting wetlands.  A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  On the other hand, the Defendants' photogramatrist has opined unequivocally that he

"was able to clearly distinguish between the open waters and their abutting wetlands" for every date of photography over the 50-year period.  Defs' SOF ¶¶ 209-210.

In addition, although the government's brief makes the bare assertion that fluctuating water in the reservoir "falls within the *Rapanos* plurality standard," there is no effort to point out any specific problem in distinguishing land from water.  Mr. Anderson, the Defendants' expert photogramatrist, consistently treats as open water any areas where the open water signature on the aerial photography predominates.  Anderson Remand Decl. ¶ 119.  Indeed he has opined that the reservoir area "would have appeared as water" to anyone who happened to be at the site on any of the pre-alteration dates of photography.  Anderson Remand Decl. ¶ 119; Defs' SOF ¶ 210.

For wetlands to be jurisdictional under the *Rapanos* Plurality, it must be difficult to distinguish the wetland from its adjacent jurisdictional water.  *See Rapanos*, 547 U.S. at 742 (Plurality opinion).  Because all of the wetlands alleged to have been adjacent to the reservoir were always distinguishable from any water in the reservoir, and because there is no genuine issue of material fact with regard to linedrawing, none of the wetlands abutting the reservoir are jurisdictional, and Defendants are entitled to summary judgment on any allegations of discharge into such wetlands.  *In re Spigel*, 260 F.3d at 31.

### b.   The Western Tributary and its Abutting Wetlands

#### i.   The Western Tributary

Mr. Anderson stated that he could not see the western tributary on any of the pre-disturbance photographic evidence reviewed by Mr. Stokely.  Anderson Decl. ¶¶ 112, 121, 129, 140.  The 1941 USGS map depicts a linear feature on the site's western side, and Mr. Stokely identified that feature as the western tributary.  Stokely 1/16/09 Dep. at 149-50.  Although the western tributary is not present on the 1977 USGS map, Mr. Stokely nevertheless concluded that it then existed.  *See* Defs

Mot. Ex. 10 at 179. Mr. Stokely could not determine, based upon the photographic and cartographic evidence, whether or not the western tributary was man-made. *See* Stokely 1/16/09 Dep. at 151, reproduced in Defs Mot. Ex. 9 at 115 ("A. What I can conclude is it's a service water drainage path. Whether it's natural, man-made, man-altered, I can't conclude."); *see also* Stokely 1/16/09 Dep. at 155, reproduced in Defs Mot. Ex. 9 at 119 ("Q. [T]he cartographic symbol for a naturally occurring stream and a drainage ditch can be the same cartographic symbol? A. Correct."). Thus, the government fails to adequately allege or produce credible evidence that the western tributary is a naturally occurring geographic feature.

In Mr. Anderson's view, the western tributary either did not exist, or, if it did, it was not a perennial stream or even an intermittent stream. Anderson Remand Decl. ¶ 161. Mr. Stokely credits the western tributary's existence largely on the basis of a 1941 USGS map, Stokely 1/16/09 Dep. at 147-51, and he also refers to it as a "very small drainage feature," *id.* at 161. As Defendants' experts have opined, USGS maps are not reliable at the scale necessary to make site-specific determinations. Anderson Remand Decl. ¶ 28; Haydock 5/22/09 Dep. at 102. The uncertain nature of what, if anything, the western tributary actually is or was makes it impossible for the government to meet its burden under the *Rapanos* Plurality test for jurisdiction. In his deposition, Mr. Stokely states that the western tributary "could be representing a ditch, or it could be just a very coarse generalization of a drainage course, and I don't know which." Stokely 1/16/09 Dep. at 150. The factual dispute over the existence of the western tributary is moot in light of two considerations. First, the government's failure to assert the stream's natural state is fatal to the government's claim. *In re Spigel*, 260 F.3d at 31. Thus, the government has failed to meet its burden that the western tributary was a natural topographic feature. Consequently, there is no genuine issue of material fact that the western tributary is man-made, and, therefore, it is not jurisdictional under the CWA.

Second, the government has failed to show that the western tributary is a relatively permanent water. A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317. Certainly the *Rapanos* Plurality could not have intended to extend jurisdiction to a ditch as unidentifiable and illusive as the western tributary. Therefore, the Defendants are entitled to summary judgment on any allegation of discharge activity in the western tributary.

In any event, the government's motion should be denied because there has not been any credible proof that there is a surface water connection between the Fosdick Street Site and the Weweantic River. The government relies on USGS maps to show a pre-alteration surface water connection, but such maps are not reliable at the scales required for this case. Anderson Remand Decl. ¶ 28. In addition, contrary to the Plaintiff's assertions, aerial photography does not confirm the USGS maps but shows numerous obstructions to and gaps between the site and the Weweantic River. Defs' SOF 211. In addition, because of the high level of agricultural development in the area downslope of the Fosdick Street Site, any pre-alteration waters at the site were likely lost or used through evapotranspiration or agricultural diversion before reaching the Weweantic River. Anderson Remand Decl. ¶¶ 157-59. Moreover, there was either no or very little surface water flow through the wetlands at the Fosdick Street Site because such wetlands were essentially flat and any surface runoff would have been minimal. Defs' SOF ¶ 149. Further, the Plaintiff's experts' monitoring of current flow conditions at the Fosdick Street Site do not establish what the flows were in pre-alteration conditions, and Plaintiff's own hydrology expert admits that even under current conditions no flow was measured at the Fosdick Street Site 50% of the time he took flow

- 45 -

measurements there in connection with his 2008 Hydrologic Report.  Horsley 1/14/09 Dep. at 14-15.

*See also* Defs' SOF ¶ 212.  Finally, the Baywatchers II report, cited approvingly by the government

(Gov't Third SOF ¶ 7), states, with regard to the Weweantic River, that "many of the bogs within

the upper watershed are not directly connected to the river."  *See* Defs Mot. Ex. 25 at 484; and Defs'

SOF ¶ 213.  There is no debate that the Fosdick Street Site is in the upper watershed of the of the

Weweantic River.  A party moving for summary judgment who does not have the burden of proof

at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that

there is insufficient evidence in the record to support an essential element of the opposing party's

claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317.  Because Plaintiff has failed to carry its burden

that the waters and wetlands at the Fosdick Street Site have a surface water connection to the

Weweantic River, " *Rapanos*, 547 U.S. at 739, 742, Defendants are entitled to summary judgment

with regard to all allegations involving the Fosdick Street Site.  *In re Spigel*, 260 F.3d at 31.

### ii.   The Wetlands Near the Western Tributary

Because Anderson could not see the western tributary on any predisturbance photographs,

he did not opine regarding the linedrawing issue, since he believed the western tributary either did

not exist predisturbance or that, if it did, it was not a relatively permanent water feature.  Because

the western tributary is not jurisdictional, neither are any wetlands that may abut it.  Consequently,

Defendants are entitled to summary judgment with regard to any allegations in connection with

discharges into the western tributary.

### C.   None of the Alleged Areas of Discharge on the Forest/Fuller Street Site Is Jurisdictional Under the *Rapanos* Plurality Test

The government contends that the Defendants:  (1) filled a portion of a canal east of Bog A

and wetlands east and south of Bog A; (2) cleared, bulldozed, and placed stockpiles in wetlands east

and south of Bog A; (3) filled "Wetland 1"; and (4) graded and filled areas of wetlands and open

waters elsewhere on the site.[56]  Gov't First Amended Complaint ¶¶ 50-54, reproduced in Defs Mot.

Ex. 6 at 054-55; Gov't Statement of Undisputed Material Facts on Liability (Pre-Remand) ¶¶ 7-8,

72-80, reproduced at Defs Mot. Ex. 2 at 018, 026-27.  None of the areas of alleged violation is

subject to CWA jurisdiction under the *Rapanos* Plurality test.

On the Forest/Fuller Site, prior to alteration activities, there was an existing cranberry bog

("Bog A"), a man-made reservoir north of Bog A, a man-made canal to the east of Bog A, wetlands

abutting Bog A, and Log Swamp Reservoir, a man-made feature.  Defs' SOF ¶¶ 151-55. The

government's Forest/Fuller Street Site allegations hinge upon the jurisdictional status of the Log

Swamp Reservoir and other small isolated areas of open water present on the site.[57]  For any of these

bodies of open water to be jurisdictional under the *Rapanos* Plurality, they must constitute naturally

formed topographic features.  For their abutting wetlands to be jurisdictional, the waters must have

nondistinct edges creating a linedrawing problem.  *See Rapanos*, 547 U.S. at 732-33, 739, 742

(Plurality opinion).

### 1.  Log Swamp Reservoir and Its Abutting Wetlands

### a.  The Reservoir Is Man-made

It is undisputed that Log Swamp Reservoir is a man-made impoundment of water, created

sometime between 1912 and 1941, designed to facilitate cranberry farming operations, Defs Mot.

Ex. 8 at 270, Anderson Decl. ¶¶ 110-11.  Defs Mot. Ex. 10 at 161; Anderson Supplemental Report,

---

[56] It is unclear from the government's complaint and pre-remand motion for summary judgment on liability if it is alleging that "Wetland 1" is included in its alleged violations.  Wetland 1 has not been an issue of contention at expert depositions and is an isolated wetland surrounded on all sides by large areas of upland.  *See* Defs Mot. Ex. 16 at 286, Figure 117.  Thus, any activity performed in Wetland 1 is nonjurisdictional.

[57] The government's photogramatrist concedes that the areas of open water to the north of Bog A are isolated from any other stream or brook.  Stokely 1/16/09 Dep at 65-66.  Mr. Anderson agrees. Anderson Remand Decl. ¶ 166.

Volume 3 of 3, dated October 26, 2009 (the "Anderson Forest/Fuller St. Sup. Rpt."), reproduced in

Defs Mot. Ex. 16.  Defs' SOF ¶ 143.  Because, there is no genuine dispute of material fact regarding

this issue, Defendants are entitled to summary judgment regarding any alleged discharges into Log

Swamp Reservoir.

> **b.    The Wetlands Abutting Log Swamp Reservoir Are Clearly**
> **Distinguishable from the Water in the Reservoir**

For wetlands to be jurisdictional under the *Rapanos* Plurality, it must be difficult to

distinguish the wetland from the nonnavigable water it abuts.  *See Rapanos*, 547 U.S. at 742

(Plurality opinion).  Mr. Anderson reviewed aerial photographs spanning over five decades from

1952-2005 and opined, "[w]ith respect to every aerial photograph that I reviewed depicting bodies

of open water, I was able clearly to distinguish between the open waters and their abutting

wetlands."  Anderson Decl. ¶ 213.  It is undisputed that there is a clear line where the water ends in

the Log Swamp reservoir and the land begins in its abutting wetlands.  *See* Anderson Remand Decl.

¶¶ 168, 175, 182, 188, 194, 200, 214; Defs Mot. Ex. 16 at 270  ("I could clearly see where the water

ended and land began on all of the above aerial photographs.").    The Plaintiffs expert

photogramatrist concurs.  Stokely 1/16/09 Dep. at 121-22 (Defs Mot. Ex. 9 at 109-10); Defs' SOF

¶ 154.  The government alleges that flooding may have impacted the distinguishability of the land

water edge, but it presents no photographic evidence that this ever occurred and it cites no other

substantial evidence to support such a conclusion.  *See* Defs' SOF ¶¶ 158, 218, 220.  A party moving

for summary judgment who does not have the burden of proof at trial should prevail and have

judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence

in the record to support an essential element of the opposing party's claim.  *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317.  Because Plaintiff has failed to carry its burden that the waters in Log Swamp

Reservoir were indistinguishable from any of the adjacent wetlands,  Defendants are entitled to

summary judgment with regard to all allegations involving the Log Swamp Reservoir and its adjacent wetlands. *In re Spigel*, 260 F.3d at 31. Therefore, none of the activities conducted by the Defendants in wetlands abutting Log Swamp reservoir violated the CWA, and Defendants are entitled to summary judgment as a matter of law regarding all such wetlands, and Plaintiff's motion on this issue should be denied.

### 2. Open Water to the North and East of Bog A and Their Abutting Wetlands

#### a. The Water

Undisputed evidence establishes that the open water to the north of Bog A and the canal to the east of Bog A are man-made bodies of water. *See* Anderson Decl. ¶¶ 169, 176, 183, 189, 195, 201, 214; Defs Mot. Ex. 10 at 167; Defs Mot Ex. 16 at 270; Stokely 1/16/09 Dep. at 65, 68 (Defs Mot. Ex. 9 at 101, 104); Defs' SOF ¶¶ 153, 155. Therefore, the Defendants are entitled to summary judgment on all allegations regarding these man-made bodies of water. *Rapanos*, 547 U.S at 733-34.

#### b. The Wetlands

It is undisputed that there is a clear line where the water ends and the abutting wetlands begin for both the reservoir to the north of Bog A and the canal to the east of Bog A. *See* Anderson Decl. ¶¶ 168, 175, 182, 188, 194, 200, 213. Defs Mot. Ex. 10 at 167; Defs Mot. Ex. 16 at 270 ("I could clearly see where the water ended and land began on all of the above aerial photographs."); Stokely 1/16/09 Dep. at 94, 104 ("Q: Okay. So with regard to the eastern bank, you can see where the water ends and the land begins, correct? A: I mean, yeah, you can see the boundary between the channelized ditch and the wetland that it's adjacent to. Q: Okay. And the same question with regard to the western bank. You can see where the water ends and the land begins, correct? A: I mean, yeah, looking from an aerial photo point of view, that's how you can map these features."). Defs' SOF ¶¶ 154, 156. Therefore, none of the activities conducted by the Defendants abutting wetlands

- 49 -

is jurisdictional under the CWA.  *Rapanos*, 547 U.S. at 742.

In addition, Defendants' expert photogramatrist concluded that there was either no or very little surface water flow through the wetlands at the Forest/Fuller Street Site because such wetlands were essentially flat, and any surface water runoff would have been minimal.  Defs' SOF ¶ 159.

### c. The Waters and Wetlands at the Forest/Fuller Street Site Are Not Jurisdictional Under the Plurality Test Because There Was Little or No Surface Water Flow from the Forest/Fuller Street Site to the Weweantic River

Rocky Meadow Brook did not have a continuous unbroken surface flow from the Forest/ Fuller Street Site to the Weweantic River under pre-alteration conditions because of the great number of barriers between the site and the river, such as upland berms, dry channels, existing cranberry bogs, agricultural reservoirs, and other wetlands.  It is highly likely that no surface water from the Forest/Fuller Street Site ever made its way downstream to the Weweantic River because of water loss through evapotranspiration (plant uptake), evaporation, the presence of dry channels, upland dikes, and agricultural reservoirs, as well as seepage through soils to become groundwater, thereby losing its character as surface water.  Water would have been obstructed by a series of man-made and naturally occurring obstacles.  Anderson Remand Decl. ¶¶ 205-12.  Defs' SOF ¶¶ 159, 216, 221; Haydock 5/22/09 Dep. at 153-55. The Baywatchers II report, cited approvingly by the government states,  regarding the Weweantic River, that "many of the bogs within the upper watershed are not directly connected to the river."  Govt Third SOF ¶ 7; Defs Mot. Ex. 52 at 484. The government admits that the Forest/Fuller Street Site is in the headwaters region and therefore the upper watershed of the Weweantic River.  Govt P & A Memo at 26.  The government's reliance on USGS maps to show a surface water connection is misplaced  because USGS mapping is based on a large scale and it has been known to misidentify ephemeral and intermittent streams as perennial streams, and cannot be relied upon where site-specific details are at issue, as they are in

this case.  Defs' SOF ¶ 217; Anderson Remand Decl. ¶ 28; Haydock 5/22/02 Dep. at 102.

For nonnavigable waters and their abutting wetlands to be jurisdictional under the *Rapanos* Plurality test, they must be connected to navigable waters by surface water connections.  *Rapanos*, 547 U.S. at 742.  Plaintiff's have not offered credible evidence that the waters and wetlands at the site had an unbroken surface water connection to the Weweantic River.  Defs' SOF ¶¶ 151-160, 214-221.  A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317.  Because Plaintiff has failed to carry its burden that the waters and wetlands at the Forest/Fuller Street Site have a surface water connection to the Weweantic River, " *Rapanos*, 547 U.S. at 739, 742, Defendants are entitled to summary judgment with regard to all allegations involving the Forest/Fuller Street Site.  *In re Spigel*, 260 F.3d at 31.

## II

## UNDER THE KENNEDY TEST, THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED, WHILE THE EVIDENCE OF THE PLAINTIFF'S EXPERTS SHOULD BE EXCLUDED UNDER *DAUBERT* PRINCIPLES

### A.  The Plaintiff's Chemical Nexus Analysis Is Flawed, Inconsistent, Scientifically Unsupportable, and Unreliable

#### 1.  The Government's Chemical Nexus Case Is Based on a Physical Impossibility

The parties agree that the Plaintiff's experts have focused their chemical nexus analyses on the extent to which pre-alteration wetlands could attenuate nutrients.  Haydock Remand Decl. ¶ 14; Marcus 1/12/09 Dep. at 72 ("The parameters I looked at were primarily nutrients.").  Plaintiff's remand experts admit that Mr. Matthew Schweisberg, Plaintiff's pre-remand wetlands scientist,

determined that pre-alteration wetlands at the Forest/Fuller Street Site and the Fosdick Street Site did not have the capacity to attenuate nutrients.  Defs' SOF ¶¶ 21-22, 28.  *See* Defs Mot. Ex. 29 at 502-03.  They admit also that Mr. Schweisberg found that the pre-alteration wetlands at the Cross Street Site had a limited capacity to attenuate nutrients and that even such limited capacity occurred only in the southern portion of the site in the immediate vicinity of Beaver Dam Brook, Defs' SOF ¶¶ 23-25, 28.  *See* Defs Mot. Ex. 29 at 504-06.  Further, Plaintiff's experts admit that Schweisberg is "one of the better wetland scientists in New England," Marcus 9/11/09 Dep. at 33, that Mr. Schweisberg's findings show pre-alteration conditions at the sites, Defs' SOF ¶ 28, and that the Plaintiff's experts ignored those findings.  Horsley 9/9/09 Dep. at 101-02 ("I did not use it.").  Instead, notwithstanding Mr. Schweisberg's findings, Plaintiff's experts used off-site studies developed by others in an effort to establish a chemical nexus between the sites and the Weweantic River.

Nitrogen is a type of nutrient, Haydock Remand Decl. ¶ 24, and the heart of Plaintiff's chemical nexus case rests upon two tables prepared by Plaintiff's expert hydrologist, set forth in the government's rebuttal report dated July 31, 2009 (the "Govt Rebuttal Report").  *See* Defs Mot. Ex. 28 at 498-99.  Haydock Remand Decl. ¶ 15.  Table 5-1 is a summary of nitrogen attenuation rates found in studies conducted by others in the Cap Cod area of Massachusetts in various Cape Cod watersheds, not in the Weweantic Watershed.  The studies were unrelated to this case and did not deal with the capacity of any pre-alteration wetlands at the sites to attenuate nitrogen.  Defs' SOF ¶ 33.  Measured nitrogen attenuation rates in wetland systems in those off-site areas in Cape Cod ranged from 8% to 97%.

The nitrogen attenuation capacity of any wetland or wetland system is site-specific and is a function of specific vegetation types in the area, the hydraulic conductivity of the shallow aquifer

in the area, other aspects of surface water hydrology, the landscape position, the mineral and organic carbon content of the soils, the cation exchange capacity and pH of the soils, as well as a variety of other factors. Defs' SOF ¶¶ 45-48. Rather than undertaking the work required to determine the site-specific details, and without even referring to the pre-remand Schweisberg work, Plaintiff's hydrologist took the broad range of 8% to 97% nitrogen attenuation from studies performed in another watershed and decided to settle upon 50% as the nitrogen attenuation capacity for the wetlands and wetland systems at the Johnson sites. Based upon a study he refers to as the "Limited Study" he also decided that a 30% attenuation rate would somehow be more conservative, and he used both the 30% and 50% nitrogen attenuation rates in his Table 5-2, claiming that those were reasonable assumptions. Defs' SOF ¶¶ 34-35. In fact, such assumptions are unreasonable where site-specific details are required to establish the extent to which specific wetlands have the capacity to attenuate nitrogen. Haydock Remand Decl. ¶ 18.

It would have been relatively straightforward for the Plaintiff's experts to have developed and implemented a protocol for measuring the nitrogen attenuation capacity of wetlands and wetlands systems at the sites at issue in this litigation, similar to the actual protocols and actual studies conducted on the watersheds and river systems listed in Table 5-1, by choosing reference wetlands and streams in the Weweantic River Watershed to show pre-alteration conditions. The results of such a study, if properly conducted, would have provided substantial information regarding the pre-disturbance ability of the sites at issue in this litigation to attenuate nitrogen, as opposed to relying on studies in other parts of the state that have not been shown to have any relevance to the Johnson sites. Haydock Remand Decl. ¶ 17.

Experts on both sides agree that different wetland types contain soils with varying capacities to attenuate nitrogen, and site-specific information is required to determine the extent to which any

given soils can in fact attenuate nitrogen. Defs' SOF ¶¶ 26, 45. The experts on both sides agree also that important soils criteria to determine nitrogen attenuation capacity include the following: organic content, organic horizons, fluctuations in the water table, the extent and degree of saturation, pH, mineral content, particle distribution, the cation exchange capacity of the soils, and the porosity, transivity, and permeability of the soils. Defs' SOF ¶¶ 26, 45-49. Plaintiff's expert soils scientist admitted that he did not conduct site-specific studies at any of the sites to determine groundwater fluctuations, specific percent of organic content, mineral content (carbon, nitrogen, sulfur), cation exchange capacity, or pH, that his soils study was limited to visually inspecting the site soils, manipulating them in his hands, and reviewing laboratory data from off-site soils that he believed were comparable to the soils at the sites, and he admitted that he did not gather any site samples for laboratory analysis. Defs' SOF ¶¶ 50- 53. He admitted also that none of the laboratory analyses he reviewed were from any soils taken within close proximity of the sites. Defs' SOF ¶ 55. In addition, the soils science experts on both sides agree that taking on-site samples and analyzing them in the laboratory for the relevant parameters to determine the actual capacity of such soils to attenuate nitrogen would not have been difficult. Defs' SOF ¶ 54.

Further, The Plaintiff's expert wetlands scientist has admitted that different wetland types provide environmental functions and values differently. Marcus 1/12/07 Dep. at 179. Yet Plaintiff's experts have not undertaken to systematically classify wetlands at the sites by type using the government approved Cowardin Classification System. Defs' SOF ¶ 79. Without knowing the correct classification of the specific type of wetland involved, it is impossible to determine the extent to which that wetland can attenuate nitrogen, Shamas Remand Decl. ¶¶ 15, 35, 37-42, and it is impossible to determine the extent to which other wetlands in the region are "similar" for purposes of aggregating wetland functions under the Kennedy test in connection with pinpointing "similarly

situated lands in the region."  Shamas Remand Decl. ¶¶ 37-42.

Table 5-2 of Plaintiff's rebuttal report, Defs Mot. Ex. 28 at 499, utilizes "mid-range" attenuation rates of 30% and 50%, in an effort to show nitrogen attenuation in four specific areas: (1) the Cross Street Site Subwatershed, (2) the Fosdick Street Site Subwatershed, (3) the Forest/ Fuller Street Site Subwatershed and (4) the larger "Confluence Watershed," incorporating the three indicated subwatersheds.

Careful analysis of Table 5-2 leads to a startling conclusion.  Over time (from 1971 to 1979), as nitrogen loadings increase and wetland acres decrease, the decreasing number of wetland acres still attenuate either 30% or 50% of the increasing nitrogen loadings, inexorably leading to the conclusion that each remaining wetland acre somehow becomes more efficient at attenuating nitrogen, which is, of course,  a physical impossibility. The Plaintiff's hydrologist admitted that Table 5-2 shows precisely that physical impossibility.  Defs' SOF ¶¶ 32-38; Horsley 9/9/09 Dep. at 108 ("A:  According to these calculations, that's true."); Haydock Remand Decl. ¶¶ 14-19; Shamas Remand Decl. ¶¶ 67-73.

## 2.  The Government's Chemical Nexus Claims Should Be Excluded from Evidence Under *Daubert* Principles Because They Are Unreliable

As set forth above in detail, a district court has the discretion to exclude expert testimony under Federal Rule of Evidence 702 in connection with a motion for summary judgment if the expert's assumptions, methodologies, or conclusions are (1) based upon insufficient facts or data, (2) unreliable, (3) based upon studies so dissimilar to the facts presented in the litigation that they are inapposite or not relevant, (4) connected to the actual facts only by the *ipse dixit* of the expert, or (5) constitute primarily the subjective, untestable conclusions of the expert.  *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).  Further, when subjected to a *Daubert* challenge, the proponent of the evidence has the burden of establishing that the

admissibility requirements are met by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

The Defendants' expert wetlands scientist has opined that the methodology and conclusions of Plaintiff's experts regarding the functions and values of wetlands in this case are based upon insufficient evidence and studies of other wetlands that have not been shown to have any similarity to the wetlands at issue in this case, and he has referred to the conclusions of Plaintiff's experts regarding the site wetlands' functions as "unreliable." Shamas Remand Decl. ¶ 43. He has also opined that the government's chemical nexus case "leads to absurd and illogical conclusions." Shamas Remand Decl. ¶ 73. The Defendants' expert hydrologist has characterized the government's chemical nexus case as leading to "necessarily false results" and as "unscientific." Haydock Remand Decl. ¶ 19. Therefore, under the well-established principles of *Daubert* and its progeny, Defendants move this Court to exclude from evidence the chemical nexus arguments of the government's experts because such arguments are (1) based upon studies so dissimilar to the facts presented in the litigation that they are inapposite or irrelevant; (2) based upon insufficient facts or data, and (3) unreliable.

### 3.  The Government's Chemical Nexus Evidence Is Contrary to the Post-*Rapanos* Guidance

In addition to being unreliable, the Plaintiff's chemical nexus case includes the nitrogen attenuation capacities of wetlands that are not "similarly situated lands in the region" under the Post-*Rapanos* Guidance because, contrary to the Guidance, they include wetlands that are not adjacent to the "relevant reach" of the same order tributary. Post-*Rapanos* Guidance 6 at n.24, 10. *See* Shamas Remand Decl ¶¶ 74-76. *See* Defs Mot. Ex. 31 at 523; Defs Mot. Ex. 23 at 464, 468. A federal administrative agency must follow its own internal guidance even if the regulated community is not bound thereby. *United States v. Caceres*, 440 U.S. 741, 752 n.14 (1979) ("'Where the rights

of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required.'") (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

### 4. Substantial, Nonspeculative Evidence Does Not Exist To Support the Government's Chemical Nexus Claims

Even if the Defendants' *Daubert* motion in connection with the government's chemical nexus case is denied, then Defendant is entitled to summary judgment on all chemical nexus issues. A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317. Plaintiff has failed to carry its burden of showing by substantial and non-speculative evidence that the pre-alteration waters and wetlands at any of the sites, either alone or in combination with similarly situated lands in the region, had a significant chemical nexus with the Weweantic River. *Rapanos*, 547 U.S. at 779-80. Therefore, Defendants are entitled to summary judgment in connection with all of the sites on the chemical nexus issue under the Kennedy test. *In re Spigel*, 260 F.3d at 31. In addition, Plaintiff's motion for summary judgment should be denied in connection with all chemical nexus issues.

## B. The Plaintiff's Physical Nexus Analysis Is Flawed, Inconsistent, Scientifically Unsupportable, and Unreliable

### 1. The Government's Groundwater Discharge/Baseflow Recharge Evidence Undercuts the Government's Physical Nexus Claims

The government's expert hydrologist admits that one of the primary considerations in his hydrologic evaluation is the capacity of the pre-disturbance wetlands to contribute to the hydrologic regime of the Weweantic River in terms of baseflow and floodflow. Horsley 2008, Hydrologic Assessment at 56, 67, and 81. *See* Defs Mot. Ex. 31 at 520-22. He admits also that the capacity of

the wetlands to contribute baseflow to the tributaries and, in turn, to the downstream Weweantic River is "of particular importance." Horsley 2008 Hydrological Assessment at 14. *See* Defs Mot. Ex. 31 at 517.

"Baseflow" is the amount of surface water in a stream that results from groundwater contribution, sometimes referred to as "recharge baseflow." It represents the same concept as "groundwater discharge," and the terms "recharge baseflow" and "groundwater discharge" are synonymous. Haydock Remand Decl. ¶¶ 27, 35.

The government's expert hydrologist conducted a watershed analysis "to determine the connectivity and continuity of the headwater tributaries and their associated wetlands with the lower reaches of the Weweantic River" by identifying the "relevant reach" of each tributary, meaning the reach of a stream of the same order, including within the relevant reach "all wetlands adjacent to the tributary." He then used the relevant reaches, determined in consultation with other government experts, to develop many of his hydrologic analyses. Horsley 2008 Hydrologic Report at 15-16, Figures 3-1, 3-2a, and 3-2b (Defs Mot. Ex. 31 at 518, 523-24); Haydock Remand Decl. ¶ 28.

The government's expert hydrologist also delineates the subwatersheds that he asserts contribute flow to each of the relevant reaches (Horsley 2008 Hydrologic Report Figure 3-1) and calculates water budgets for each of the three subwatersheds as well as the larger Confluence Watershed (the watershed defined by the Confluence of South Meadow Brook and Rocky Meadow Brook) and the 4.4 Mile Watershed of the Weweantic River (Horsley 2008 Hydrologic Assessment Table 3-1) Defs Mot. Ex. 31 at 529. Horsley 2008 Hydrologic Assessment 15-17; Haydock Remand Decl. ¶ 29.

Among other things, Table 3-1 of the Horsley 2008 Hydrologic Assessment assigns different recharge rates for different land uses and land types. Wetlands are assigned a recharge rate of "0.0"

inches/year and uplands a recharge rage of "27" inches per year.  The source of the recharge values is referenced as the 1992 USGS report on the Plymouth/Carver Aquifer.  Horsley 2008 Hydrologic Assessment Table 3-1, reproduced in Defs Mot. Ex. 31 at 529; Haydock Remand Decl. ¶ 30.  The government's expert hydrologist stated that he was "confident" in his conclusion that the relevant wetlands in the subwatersheds provide zero groundwater discharge/recharge baseflow to the adjacent tributaries and the Weweantic River.  Horsley 1/14/09 Dep. at 134.  Table 3-1 shows that uplands, not wetlands, constitute  the greatest baseflow contribution to the Weweantic River. Haydock Remand Decl. ¶ 31.

Thus, the Plaintiff's own Table 3-1 shows, irrefutably, that, because the pre-alteration wetlands at the Cross Street Site, the Fosdick Street Site, and the Forest/Fuller Street Site each contribute "0.0" million gallons per year toward recharge baseflow and toward the total flow in their respective watersheds, the presence of wetlands at the sites and at "similarly situated lands in the region" do not contribute *any* baseflow to the Weweantic River, let alone any significant baseflow. Haydock Remand Decl. ¶¶ 32, 36; Defs' SOF ¶ 62.  Therefore, according to the government's own evidence, the wetlands at issue in this case have no physical nexus to the Weweantic River in so far as baseflow contribution is concerned.

Because Table 3-1 contradicted assertions made by the Plaintiff's expert hydrologist to the effect that groundwater at the Johnson sites contributed to baseflow, the Defendants' expert hydrologist reviewed the data underlying the site-specific work of the Plaintiff's expert hydrologist, as set forth in the Horsley 2001 Hydrologic Assessment Report.  Haydock Remand Decl. ¶ 37.  That review led the Defendants' expert hydrologist to opine that,  "The conclusions reached by Horsley regarding pre-alteration hydrologic conditions, based in large part on his 2001 report, are speculative at best and can not be relied upon."  Haydock Remand Decl. ¶ 121.

**2.    The Government's Evidence Regarding Surface Water Flow Is Faulty**

The Plaintiff's expert hydrologist measured post-alteration flows at streams located at the Cross Street, Fosdick Street, and Forest/Fuller Street Sites during the period 2007-2009, but realized that these measurements do not actually reflect pre-alteration flows.  Government July, 2009, Rebuttal Report Table 6-1(Cross Street), Table 6-2 (Fosdick Street), Table 6-3 (Forest/ Fuller Street); Horsley 2008 Hydrologic Assessment Table 4-1 (Cross Street), Table 4-2 (Fosdick Street), Table 4-3 (Forest/Fuller Street); Haydock Remand Decl. ¶ 44; Defs Mot. Ex. 30.  To provide an estimate of pre-alteration flows at the sites, the Plaintiff's expert hydrologist selected an "index stream" located in Wareham, Massachusetts,  Horsley 2008 Hydrologic Assessment Figure 3-15; Defs Mot. Ex. 31 at 528; Haydock Remand Decl. ¶ 44, but conditions at the Wareham Index Stream are vastly different from pre-alteration stream conditions at the three sites. Haydock Remand Decl. ¶¶ 45-46.  To deal with this issue, Plaintiff's expert hydrologist selected other streams in eastern Massachusetts as additional index streams, which had stream gauging stations maintained by the U.S. Geologic Survey, known as "Indian Mead Brook," "Red Brook," "Dorchester Brook," and "Fall Brook."  Horsley 2008 Hydrologic Assessment Table 3-2, Figure 3-11; Defs Mot. Ex. 31 at 530; Haydock Remand Decl. ¶ 47.  Data from the additional index streams is not indicative of pre-alteration conditions at the Johnson sites because:  (1) flow measurements at the Johnson sites were taken from 2007 to 2009, while flow measurements at the additional index streams were from different dates (for example, flow measurements taken at Padding Brook were collected by USGS between 1958 and 1962) and no rainfall data for either period was provided by the government's experts; (2) the measurements of the USGS wells were reported as average monthly stream flows, while the measurements at the three sites are discrete measurements collected on specified days; (3) the methodology used to measure flow was flawed; (4) the USGS stream measurements reflect

total flows within the watershed, while the government's measurements at the Cross Street Site subwatershed do not; (5) there are anomalies in the results of the governments data summarizing measurements at the three sites from 2007-2009 showing that water levels and flow observations do not match; (6) the government's conclusion regarding the differences between the USGS data at the index streams and the data colleted from the three sites are flawed.  Haydock Remand Decl. ¶¶ 48-55.  Defs' SOF ¶¶ 67-71.  Therefore, the index streams do not establish pre-alteration flows at the sites and add nothing to the government's claims regarding any physical nexus between the Johnson sites and the Weweantic River.  With respect to the data from the index streams, Defendants' hydrologist opined that "Plaintiff's efforts to show pre-disturbance flow conditions at the Defendants' sites are (1) based on insufficient and incorrect data, (2) based on flawed assumptions and methodologies, and (3) speculative."  Haydock Remand Decl ¶ 55.

### 3.   The Government Has Not Shown the Extent to Which Floodflow Alteration Occurred at the Johnson Sites

"Flood storage" or "floodflow alteration" may occur in wetlands during flood events when water levels within adjacent streams overtop the banks and the flood waters are stored within the wetlands.  Subsequent to the precipitation event, this water is released to downstream resources.  Government July, 2009, Rebuttal Report at 10; Haydock Remand Decl. ¶ 38.

The government's experts have not provided evidence that the pre-disturbance wetlands at the sites performed any significant flood storage or floodflow alteration function with regard to the

Weweantic River.  Haydock Remand Decl. ¶ 41[58]; Anderson Remand Decl. ¶ 109.[59]  Indeed,

Plaintiff's expert wetlands scientist has  admitted that Beaver Dam Brook at the Cross Street Site

has a "small" flood plain.  Marcus 1/12/09 Dep. at 28 ("For instance, Beaver Dam Brook, which

runs by the Cross Street site, provides a function of flood flow alterations that is, it has a small flood

plain, it overflows.").  Therefore, the evidence regarding the role of site wetlands in floodflow

alteration is either nonexistent or shows that, if the site wetlands provided such a function, the extent

of that function has not been quantified.  With respect to the government's floodflow alteration

argument, Defendants' hydrologist opined that because no quantification is provided, "any

conclusions regarding the floodflow alteration functions of these particular wetlands are speculative

at best and therefore unreliable."  Haydock Remand Decl. ¶ 43.

### 4.   The Government's Physical Nexus Claims Should Be Excluded from Evidence Under *Daubert* Principles Because They Are Unreliable

A district court has the discretion to exclude expert testimony under Federal Rule of

Evidence 702 in connection with a motion for summary judgment if the expert's assumptions,

methodologies, or conclusions are (1) based upon insufficient facts or data, (2) unreliable, (3) based

upon studies so dissimilar to the facts presented in the litigation that they are inapposite or not

relevant, (4) connected to the actual facts only by the *ipse dixit* of the expert, or (5) constitute

primarily the subjective, untestable conclusions of the expert.  *Cortes-Irizarry*, 111 F.3d at 188.

---

[58]  "Although wetlands have the potential to contribute to downstream floodflow alteration, the extent to which the wetlands at issue in this case have done so during pre-alteration conditions is unknown.  Even if the wetlands performed same floodflow alteration function (which has not been shown) whether that function was minor or significant or somewhere in-between remains a mystery in this case because there is no credible site-specific evidence bearing on this issue."

[59]  "Reviewing aerial photography spanning a period of over 50 years, I saw no photographic evidence that any of the open waters at the Cross Street site flooded over their banks over this 50-year period, although I did identify narrow band of wetlands adjacent to Beaver Dam Brook that I identified as "Floodplain wetlands.""

Further, when subjected to a *Daubert* challenge, the proponent of the evidence has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175-76.  As set forth above in detail, the government's physical nexus case has been described by Defendants' experts as based on "insufficient and incorrect data" and "flawed assumptions and methodologies." Indeed, Defendants' experts have opined that the government's physical nexus case is "speculative at best and therefore unreliable."  Therefore, under the well-established principles of *Daubert* and its progeny, Defendants move this Court to exclude the physical nexus arguments of the government because such arguments are (1) based upon insufficient facts or data, (2) based upon flawed assumptions, and (3) unreliable.

### 5. Substantial, Nonspeculative Evidence Does Not Exist To Support the Government's Physical Nexus Claims

If the Defendants' *Daubert* motion in connection with the government's physical nexus case is denied, then Defendant is entitled to summary judgment under the Kennedy test on all physical nexus issues.  A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317.  Plaintiff has failed to carry its burden of showing by substantial and nonspeculative evidence that the pre-alteration waters and wetlands at any of the sites, either alone or in combination with similarly situated lands in the region, had a significant physical nexus with the Weweantic River. *Rapanos*, 547 U.S. at 779-80.  Therefore, Defendants are entitled to summary judgment in connection with all of the sites on the physical nexus issue under the Kennedy test.  *In re Spigel*, 260 F.3d at 31.  In addition, Plaintiff's motion for summary judgment should be denied in connection with all physical nexus issues.

**C.   The Plaintiff's Biological Nexus Analysis Is Flawed, Inconsistent, Scientifically Unsupportable, and Unreliable**

    **1.   The Pre-Alteration Biological Nexus Evidence Is Virtually Nonexistent**

The government's expert wildlife biologist and wetlands scientist admits that all wildlife species are not attracted to all types of wetlands,  Marcus 9/11/07 Dep. at 99-102; Marcus 1/12/09 Dep. at 224 ("Different wetland types have different habitat structure.  So a forested wetland is more structurally complex than a wet meadow.  I would expect to see more animals, different species, in forested wetland than in the wet meadow."), and that there are significant differences among wetland types.   Marcus 1/12/09 Dep. at 225.[60]   Yet not any of the Plaintiff's experts conducted a comprehensive evaluation to classify the pre-disturbance wetland types located at the sites.  *See* Shamas Remand Decl. ¶¶ 15-52.

The government's expert wildlife biologist and wetlands scientist admits generally that he did not reach my conclusions regarding what wildlife species would have been present at the pre-alteration sites, Marcus 0/11/09 Dep. at 205-07, and admits specifically, that he "did not do a pre-disturbance evaluation of aquatic insects at all," Marcus 1/12/07 Dep. at 199, and that he did not study the order of temperature change in any of the wetlands he visited.  Marcus 1/12/07 Dep. at 227.  *See* Shamas Remand Decl. ¶¶ 77-88.  Therefore, with regard to the biological nexus issue, the government literally provides no evidence of the wildlife species that would have been present at the Johnson sites under pre-alteration conditions, but simply lists current species that have been observed at the sites.  The Defendants' expert wildlife biologist criticized this approach in the following way:  "In his wildlife biology evaluation, Mr. Marcus does not explain (1) what wildlife

---

[60]    Q:    Okay.  So—so there are significant differences among types of wetlands, correct?

    A:    I would agree.

species were present at the sites pre-alteration, (2) whether those species could freely migrate back and forth between the relevant sites and the Weweantic River, or (3) the impacts of benefits to the Weweantic River of any such pre-disturbance species that may or may not have been located at the relevant sites." Marcus Remand Decl. ¶ 82.  Consequently, with regard to biological nexus, the Plaintiff's experts fail to connect the dots between the pre-alteration wetlands at the Johnson sites and the Weweantic River.

### 2. The Government's Biological Nexus Claims Should Be Excluded from Evidence Under *Daubert* Principles Because the Biological Evidence Is Unreliable

As set forth above in detail, a district court has the discretion to exclude expert testimony under Federal Rule of Evidence 702 in connection with a motion for summary judgment if the expert's assumptions, methodologies, or conclusions are (1) based upon insufficient facts or data, (2) unreliable, (3) based upon studies so dissimilar to the facts presented in the litigation that they are inapposite or not relevant, (4) connected to the actual facts only by the *ipse dixit* of the expert, or (5) constitute primarily the subjective, untestable conclusions of the expert. *Cortes-Irizarry*, 111 F.3d at 188.  Further, when subjected to a *Daubert* challenge, the proponent of the evidence has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175-76.

The Defendants' expert wetlands biologist has opined that the methodology and conclusions of Plaintiff's experts regarding the biological nexus issues in this case are based upon insufficient evidence and are speculative because the degree to which the pre-alteration wetlands at the sites functioned as habitat for wildlife, fish, and aquatic organisms has not been determined or quantified by Plaintiff's experts, nor have the Plaintiff's experts even listed the pre-alteration species that used the pre-alteration sites as habitat.  Shamas Remand Decl. ¶ 86. Defendants' wildlife biology expert

characterized the government's biological nexus conclusions as "speculative" because the evidence backing up the conclusions simply does not exist.  Shamas Remand Decl. ¶¶ 77-88.  Under the well-established principles of *Daubert* and its progeny, Defendants move this Court to exclude from evidence the chemical nexus arguments of the government's experts because such arguments are (1) based upon insufficient facts or data, (2) speculative, and (3) unreliable.

### 3.   Substantial, Nonspeculative Evidence Does Not Exist To Support the Government's Biological Nexus Claims

A party moving for summary judgment who does not have the burden of proof at trial should prevail and have judgment entered in its favor as a matter of law upon a showing that there is insufficient evidence in the record to support an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317.  Plaintiff has failed to carry its burden of showing by substantial and nonspeculative evidence that the pre-alteration waters and wetlands at any of the sites, either alone or in combination with similarly situated lands in the region, had a significant biological nexus with the Weweantic River.  *Rapanos*, 547 U.S. at 779-80.  Therefore, Defendants are entitled to summary judgment in connection with all of the sites on the biological nexus issue under the Kennedy test.  *In re Spigel*, 260 F.3d at 31.  In addition, Plaintiff's motion for summary judgment should be denied on all biological nexus issues.

### III

### MANY OF THE WETLANDS AT THE SITES QUALIFY FOR THE REGULATORY EXCLUSION OF WETLANDS ADJACENT TO WETLANDS UNDER BOTH THE PLURALITY TEST AND THE KENNEDY TEST

As set forth above, both the Plurality and Justice Kennedy reject the broad regulatory definition of "adjacent," while the Kennedy test requires that the exclusion be applied in the context of the great variety of wetland types and the different mix of environmental wetland functions

provided by each wetland type.  Anderson Remand Decl. ¶¶ 13-25; Shamas Remand Decl. ¶¶ 26, 34-43. Moreover, in order to properly "aggregate" the functions and values provided by the pre-alteration wetlands at the Johnson sites with those of "similarly situated lands in the region," it is imperative to first determine what pre-alteration wetland types actually existed at the Johnson sites so that one could ascertain which wetlands not on the Johnson sites but within the region should be deemed "similarly situated."  *See* Defs' SOF ¶¶ 79-121.

The regulations provide for an exclusion from the definition of the term "waters of the United States" for wetlands adjacent to wetlands.  40 C.F.R. § 230.3(s)(7); 33 C.F.R. § 328.3(a)(7). Because the Plaintiff's experts did not conduct a comprehensive evaluation of wetlands by type at any of the sites, Defendants' expert photogramatrist undertook to do so. Anderson Remand Decl. ¶¶ 13-25.  For each date of photography spanning a period of approximately 50 years, Mr. Anderson observed a variety of wetland types, and he concluded that many of the wetlands abutted each other but did not abut open water.  Anderson Decl. ¶¶ 103, 163, 216.  The government has not come forward with any evidence showing that Mr. Anderson's depictions are incorrect.  The Kennedy test requires every wetland that is not "adjacent" to a navigable-in-fact water to undergo the jurisdictional test on a case-be-case basis.  *Rapanos*, 547 U.S. at 782.  The only way to give meaning to the regulatory exclusion and remain true to the Kennedy test is to classify wetlands by type and to determine which wetland types abut open water and which do not.  As indicated, only Defendants' expert photogramatrist did so in this case.  All pre-alteration wetlands meeting the regulatory exclusion of wetlands-adjacent-to-wetlands are described and depicted by Anderson in Anderson Remand Decl. ¶¶ 34, 43, 53, 59, 65, 71, 76, 81, 86, 91, 96, 117, 125, 133, 142, 171, 178, and the corresponding figures associated therewith.  As Plaintiff's have produced no evidence to contradict these descriptions and depictions of wetlands adjacent to wetlands, the regulatory

exclusion applies, and the Defendants are entitled to summary judgment with regard to all such wetlands within the exclusion. *In re Spigel*, 260 F.3d at 31.

## IV

## NAVIGABILITY OF THE WEWEANTIC
## RIVER BEGINS AT THE MILE 4.4 POINT

The government admits that the Corps of Engineers has determined that the Weweantic River is navigable beginning at Mile 4.4, which generally corresponds to the area known as the Lower Weweantic River. Govt SOF ¶¶ 1-4, Defs' SOF ¶¶ 168-170, Defs Mot. Ex. 26 at 486.  Although the government asserts that the Weweantic River is navigable-in-fact from the confluence, it admits that it determined navigability by "canoe and kayak trips in the Weweantic River," but provides no evidence regarding which portions of the Weweantic River were kayaked by the government's experts and which portions were canoed.  Government Brief at 13.  Under the Commerce Clause standard, navigability is a function of whether a waterbody is navigable by canoe and not by kayak, because a canoe is the type of watercraft that was used traditionally in commerce and a kayak was not. *PacifiCorps Elec. Operations*, 73 FERC ¶ 61,365, at *4 (1995); *see PacifiCorps*, 73 FERC ¶ 61,365, at *62,141 n.26; *United States v. Appalachian Elec. Power Co.*, 311 U.S. at 407-09.  In addition, the government proffers the affidavit of an individual named Christine Zaremba, stating that she is a member of a club that takes canoe trips in portions of the  Weweantic River, without specifying the precise locations.  Based upon information and belief, Ms. Zaremba was not formally offered for deposition by Plaintiff to Defendants during the approximately two-year post-remand discovery period, and consequently Defendants did not have the opportunity to depose her.  In any event, having failed to show that the Weweantic River is navigable-in-fact under the Commerce Clause north of the Mile 4.4 point, the government has not met its burden that navigability begins at any point north of the Mile 4.4 point.  Therefore, the Court should hold that the Weweantic is

navigable only south of the Mile 4.4 point, which is approximately the point where the Lower

Weweantic River begins.  *See* Defs Mot. Ex. 26 at 486.

V

**ADDITIONAL SPECIFIC RESPONSES
TO THE GOVERNMENT'S STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Defendants' additional specific responses to the government's Statement of Undisputed

Material Facts are set forth in Defs' SOF ¶¶ 168-277, which paragraphs are incorporated herein by

reference.

**CONCLUSION**

For the foregoing reasons, the Defendants' motion for summary judgment should be granted,

the Plaintiff's motion for summary judgment should be denied, the Defendants' motion for exclusion

of the Plaintiff's experts testimony under *Daubert* principles in connection with the Kennedy test

should be granted, the Court should refuse to decide any aspect of these remand proceedings based

solely on the pre-remand record, and the Court should hold that the wetlands-adjacent-to-wetlands

exclusion applies to all wetland types that abut other wetlands and do not abut open water.

DATED:  May 28, 2010.

Respectfully submitted,

|  |  |
|---|---|
| \_\_\_/s/ Gregory D. Cote_____ | By \_\_\_/s/ Theodore Hadzi-Antich_____ |
| GREGORY D. COTE, BBO # 645943 | THEODORE HADZI-ANTICH (*Pro Hac Vice*) |
| McCarter & English, LLP | M. REED HOPPER (*Pro Hac Vice*) |
| 265 Franklin Street | Pacific Legal Foundation |
| Boston, Massachusetts 02110 | 3900 Lennane Drive, Suite 200 |
| Telephone:  (617) 449-6500 | Sacramento, California 95834 |
| gcote@mccarter.com | Telephone:  (916) 419-7111 |
|  | Facsimile:  (916) 419-7747 |
|  | tha@pacificlegal.org |
|  | mrh@pacificlegal.org |

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

The foregoing DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COMBINED MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56(b) AND RULE 56(d)(1) AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT was filed electronically on the date below.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

DATED:  May 28, 2010.          ___/s/ Theodore Hadzi-Antich_____
                               THEODORE HADZI-ANTICH (*Pro Hac Vice*)
                               Counsel for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Civil Action No. 99-12465-EFH |
| | ) |
| Plaintiff, | ) |
| | ) **EXHIBITS TO DEFENDANTS'** |
| v. | ) **MEMORANDUM IN SUPPORT** |
| | ) **OF ITS MOTION FOR** |
| CHARLES JOHNSON, FRANCIS VANER JOHNSON,) | **SUMMARY JUDGMENT AND** |
| GENELDA JOHNSON, and JOHNSON | ) **OPPOSITION TO THE UNITED** |
| CRANBERRIES LIMITED PARTNERSHIP, a | ) **STATES' MOTION FOR** |
| Massachusetts limited partnership, | ) **SUMMARY JUDGMENT** |
| | ) |
| Defendants. | ) |

## TABLE OF CONTENTS/INDEX

| **Exhibit** | **Document** | **Pages** |
|---|---|---|
| 1 | U.S. Motion to Govern Proceedings on Remand (And Court Order dated May 3, 2007) | 001-015 |
| 2 | U.S. Statement of Undisputed Material fact on Liability (Pre-Remand) | 016-027 |
| 3 | Weweantic Watershed Map | 028-029 |
| 4 | Water Feature Dimensions South of Cross Street Site | 030-031 |
| 5 | Declaration of Government's Expert Matthew Schweisberg in Support of U.S. Pre-Remand Motion for Partial Summary Judgment on Liability | 032-041 |
| 6 | U.S. First Amended Complaint | 042-057 |
| 7 | Figure 8 of Expert Supplemental Report of John Anderson (October 2009) | 058-059 |

- 1 -

| Exhibit | Document | Pages |
|---|---|---|
| 8 | Volume 1 of 3 of Defendants' Expert Supplemental Report of John Anderson (Cross Street Site, October 9, 2009) | 060-096 |
| 9 | Deposition Transcript of Peter Stokely 1/16/09 (Excerpts) | 097-155 |
| 10 | Defendants' Expert Report of John Anderson, February 4, 2009 | 156-206 |
| 11 | U.S. Depiction of Areas of Alleged Violation at the Cross Street Site (April 2001) Figure 9C | 207-208 |
| 12 | Figures Depicting the Unnamed Tributary at the Cross Street Site | 209-212 |
| 13 | Figure 28 (Page 36) of John Anderson's 2/4/09 Expert Report (1960 photo not showing unnamed tributary) | 213-214 |
| 14 | Figure 16 (Page 21) of Defendants' John Anderson's 2/4/09 Expert Report (1977 map not showing "western tributary") | 215-216 |
| 15 | Volume 2 of 3 of Defendants' Expert Supplemental Report of John Anderson, October 2009 (Fosdick Street Site, October 23, 2009) | 217-267 |
| 16 | Volume 3 of 3 of Defendants' Expert Supplemental Report of John Anderson, October 2009 (Forest Fuller Street Site, October 26, 2009) | 268-320 |
| 17 | Classification of Wetlands and Deepwater Habitats of Wetlands of the United States, Cowardin, et al. (U.S. Fish and Wildlife Service) (the "Cowardin Classification System") | 321-374 |
| 18 | Summary of the Cowardin Classification System | 375-393 |
| 19 | Data Collection Requirements and Procedures for Mapping Wetland, Deepwater, and Related Habitats of the United States (U.S. Fish and Wildlife Service, July 2009) | 394-406 |
| 20 | Government Expert Peter Stokely's Depiction of "Cover Type" at the Three Johnson Sites | 407-410 |
| 21 | U.S. Army Corps of Engineers Highway Methodology Workbook Supplement | 411-450 |
| 22 | "New England Wildlife:  Habitat, Natural History, and Distribution," Degraf, et al., 1983 with 2001 Supplement, prepared for United States Department of Agriculture (Excerpts) | 451-457 |
| 23 | EPA and Corps of Engineers Post-*Rapanos* Guidance | 458-472 |

| Exhibit | Document | Pages |
|---|---|---|
| 24 | "Impacts of Freshwater Wetlands on Water Quality: A Landscape Perspective," Whigham, et al., 1988 | 473-478 |
| 25 | Baywatchers II Report: Nutrient Related Water Quality of Buzzard's Bay Embayment, Homes, et al., 1999 | 479-484 |
| 26 | Map showing the Johnson Sites in relation to the Upper Weweantic River and the Lower Weweantic River | 485-486 |
| 27 | Massachusetts Year 2008 Integrated List of Waters | 487-492 |
| 28 | Tables 5-1 and 5-2 from the Government's Rebuttal Report, July 31, 2009 | 493-499 |
| 29 | Plaintiff's Expert Matthew Schweisberg, U.S. Environmental Protection Agency, Function and Values Forms for the Forest Fuller Street, Fosdick Street, and Cross Street Sites, from Schweisberg 2001 Report | 500-506 |
| 30 | Tables 6-1 through 6-3 from the Government's Rebuttal Report, July 31, 2009 | 507-512 |
| 31 | Report of Plaintiff's Expert Scott Horsley 2008 Hydrologic Assessment (October 31, 2008) (Excerpts) | 513-531 |
| 32 | Section 5.5 of "On-Site Soil Investigations," from Government's Rebuttal Report, July 31, 2009 | 532-537 |
| 33 | Expert Report of Defendants' Expert Samuel Haydock, February 6, 2009 | 538-616 |
| 34 | Plaintiff's Expert Report of Scott Horsley, Hydrologic Assessment, 2001 (Excerpts) | 617-642 |
| 35 | Plaintiff's Expert Matthew Schweisberg's Pre-Remand Remedy Declaration | 643-660 |

## ADDITIONAL DEPOSITION TRANSCRIPTS

| Exhibits | Additional Deposition Excerpts | Pages |
|---|---|---|
| 36 | Scott Horsley, 1/14/09 | 661-705 |
| 37 | Scott Horsley, 9/9/09 | 706-811 |
| 38 | Scott Horsley, 2/10/10 | 812-835 |
| 39 | Michael Marcus, 1/12/09 | 836-894 |
| 40 | Michael Marcus, 9/11/09 | 895-956 |
| 41 | Peter Fletcher, 9/4/09 | 957-1022 |
| 42 | Jeffrey Shamas, 3/16/09 | 1023-1030 |
| 43 | Jeffrey Shamas, 5/27/09 | 1031-1034 |
| 44 | Daniel Hageman, 5/26/09 | 1035-1054 |
| 45 | Samuel Haydock, 5/22/09 | 1055-1077 |
| 46 | John Anderson, 3/11/09 | 1078-1081 |
| 47 | John Anderson, 12/15/09 | 1082-1088 |

### *Miscellaneous*

| | | |
|---|---|---|
| 48 | Charles Johnson Depiction of Unnamed Tributary at the Cross Street Site | 1089-1090 |